**HYUNDAI MOTOR COMPANY, Hyundai Motor America, Inc., and Port City Hyundai, Inc., Petitioners,**

v.

**Mario ALVARADO, et al., Respondents.**

No. 95–0969.

Supreme Court of Texas.

Argued Sept. 3, 1996.

Decided June 5, 1998.

Rehearing Overruled Sept. 24, 1998.

Ruth G. Malinas, San Antonio, David E. Keltner, Fort Worth, David M. Heibron, Leslie G. Landau, San Francisco, David M. Prichard, Thomas H. Crofts, San Antonio, Vincent S. Walkowiak, Dallas, Malcolm E. Wheeler, Denver, CO, for Petitioners.

Christa Brown, Austin, Rebecca E. Hamilton, Rockwall, Steve T. Hastings, Corpus Christi, for Respondents.

SPECTOR, Justice, delivered the opinion of the Court, in which GONZALEZ, BAKER, ABBOTT and HANKINSON, Justices, join.

Congress passed the National Traffic and Motor Vehicle Safety Act of 1966 "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." 15 U.S.C. § 1381[1] (recodified at 49 U.S.C. § 30101). The issue before us is whether the Act and its implementing regulations preempt common-law claims asserting that a vehicle's passenger restraint system was defectively designed because the manufacturer failed to install lap belts. The court of appeals concluded that these claims were not preempted. 908 S.W.2d 243. We hold that the claims were neither expressly nor impli-

edly preempted, and affirm the judgment of the court of appeals.

## I. Background

Eighteen-year-old Mario Alvarado and his younger brother, Fidel, were passengers in a Hyundai Excel driven by Mario's classmate, Vince Reyes. The Excel's front seats were equipped with a two-point passive restraint system. A shoulder belt automatically moved into place across the passenger's chest when the vehicle's door closed, and there was a ramp seat and knee bolster to help prevent passengers from submarining under the dash in the event of a collision. This two-point assembly did not include a lap belt.

Mario was in the front passenger seat, and his brother was riding in the rear of the car. It was raining, and as Reyes attempted to pass another vehicle, the Excel skidded off the road and rolled over. Mario was wearing his seatbelt, but was ejected through the sunroof. As a result, he is paralyzed from the chest down. Fidel and Reyes incurred lesser injuries.

Mario and his parents sued Hyundai Motor Company, Hyundai Motor America, Inc., and Port City Hyundai, Inc. (Hyundai).[2] They alleged that the Excel was defectively designed because it was not equipped with lap belts, that Hyundai failed to provide adequate warnings of the increased danger resulting from the lack of lap belts, and that Hyundai failed to give adequate instructions for the use of the vehicle's restraint system. They also alleged that Hyundai was negligent and grossly negligent based upon the same acts or omissions.

Hyundai moved for partial summary judgment, asserting that the Alvarados' claims based upon the lack of a lap belt were preempted by the Safety Act and its implementing regulations. The trial court granted

---

1. Although the Safety Act was initially codified in chapter 15 of the United States Code, the federal statutes regarding transportation, including the Safety Act, were reorganized and moved to chapter 49 in 1994. *See* Pub.L. No. 103–272, 108 Stat. 745 (1994). The 1994 Act states that this reorganization was made "without substantive change," *id.* at 745, and indeed those portions of the Safety Act relevant to this case were substan- tively unchanged. Because the court of appeals and the parties refer to the pre–1994 statutes, in the interest of consistency we will do likewise.

2. Fidel Alvarado, Jr. and Alicia Alvarado, Mario's parents, sued in their individual capacities and as the younger Fidel's next friends.

the motion. The Alvarados then filed a notice of nonsuit and later refiled their case in a different county. In response, Hyundai requested that the first trial court modify its nonsuit order to provide that it was with prejudice to the claims adjudicated by the partial summary judgment, and the trial court did so.

The Alvarados appealed both the dismissal with prejudice and the merits of the partial summary judgment. *Alvarado v. Hyundai Motor Co.*, 885 S.W.2d 167 (Tex.App.—San Antonio 1994), *rev'd*, 892 S.W.2d 853 (Tex. 1995). The court of appeals concluded that the dismissal should not have been with prejudice and did not reach the preemption issues. Hyundai then sought review here. We held that a nonsuit sought after a trial court grants a partial summary judgment results in a dismissal with prejudice on the issues disposed of by the summary judgment, thus converting the partial summary judgment into a final, appealable judgment. *Hyundai Motor Co. v. Alvarado*, 892 S.W.2d at 855. We remanded the case to the court of appeals to allow it to consider the Alvarados' contention that their "no lap belt" claim was not preempted. *Id.* On remand, the court of appeals held that there was no express or implied preemption of claims and reversed the trial court's judgment. 908 S.W.2d at 253. We granted Hyundai's application for writ of error challenging these holdings.

## II. Statutory overview

Congress enacted the National Traffic and Motor Vehicle Safety Act of 1966 in response to the accelerating spiral of deaths and injuries resulting from unsafely designed vehicles. *See* S.Rep. No. 89–1301, *reprinted in* 1966 U.S.C.C.A.N. 2709, 2709–10; H.R.Rep. No. 89–1776, at 10–11 (1966); John F. McCauley, Note, *Cipollone & Myrick: Deflating the Airbag Preemption Defense*, 30 Ind. L.Rev. 827, 829 (1997). The Act's explicit purpose is "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." 15 U.S.C. § 1381 (recodified at 49 U.S.C. § 30101). To accomplish that purpose, Congress empowered the Secretary of Transportation to adopt motor vehi-

cle safety standards. *Id.* § 1392(a) (recodified at 49 U.S.C. § 30111(a)). While the standards must be "reasonable, practicable and appropriate," *id.* § 1392(f)(3) (recodified at 49 U.S.C. § 30111(b)(3)), Congress intended that "*safety shall be the overriding consideration* in the issuance of standards." S.Rep. No. 89–1301, *reprinted in* 1966 U.S.C.C.A.N. at 2714 (emphasis added); *see* 15 U.S.C. § 1392(a) (recodified at 49 U.S.C. § 30111(a)) ("The Secretary shall establish by order appropriate Federal motor vehicle safety standards ... [that are] practicable, *shall meet the need for motor vehicle safety*, and shall be stated in objective terms.") (emphasis added).

The Safety Act has an express preemption clause that provides:

Whenever a Federal motor vehicle safety standard established under this title is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard. Nothing in this section shall be construed as preventing any State from enforcing any safety standard which is identical to a Federal safety standard.

15 U.S.C. § 1392(d) (recodified at 49 U.S.C. § 30103(b)). It also has a savings clause providing that "[c]ompliance with any Federal motor vehicle safety standard issued under this title does not exempt any person from any liability under common law." 15 U.S.C. § 1397(k) (recodified at 49 U.S.C. § 30103(e)).

The standards the Secretary adopts under the Safety Act are, fundamentally, performance requirements, not design requirements. *See id.* § 1392(a) (recodified at 49 U.S.C. § 30111(a)) (requiring that standards shall "be stated in objective terms"); *Perry v. Mercedes Benz of N. Am., Inc.*, 957 F.2d 1257, 1260 (5th Cir.1992); *Hernandez–Gomez v. Leonardo*, 185 Ariz. 509, 917 P.2d 238, 244 (1996). The legislative history of the Safety Act makes that fact clear:

[T]he new and revised standards are expected to be performance standards, specifying the required minimum safe performance of vehicles but not the manner in which the manufacturer is to achieve the specified performance.

. . . .

The Secretary would thus be concerned with the measurable performance of a braking system, but not its design details. S.Rep. No. 89–1301, *reprinted in* 1966 U.S.C.C.A.N. at 2714.

The Secretary has adopted Safety Standard 208, which establishes crash protection performance requirements, expressed in terms of forces exerted on anthropomorphic test dummies, for passenger restraint systems. *See* 49 C.F.R. § 571.208 (1988).[3] For cars built between September 1, 1987 and September 1, 1988,[4] Standard 208 provides several options for compliance. Three of those options specifically condition the applicable performance standard upon the particular type of restraint system that is used. *See* 49 C.F.R. § 571.208, S4.1.2.1, S4.1.2.2, S4.1.2.3.

Hyundai elected to comply with what is, in effect, a fourth option, S4.5.3. S4.5.3 allows a manufacturer to use an automatic seatbelt "to meet the crash protection requirements of any option under S4. and in place of any seat belt assembly otherwise required by that option." 49 C.F.R. § 571.208, S4.5.3. Hyundai claims that it complied with the crash protection requirements of S4.1.2.2. This option establishes criteria for frontal crashes, but not for rollovers, the type of accident that injured the Alvarados. *Id.* § 571.208, S4.1.2.2. The question we must resolve is whether the Safety Act and the regulations under it preempt common-law damage claims if the manufacturer chooses an option permitted by the federal regulations.[5]

### III. Preemption

Under the Supremacy Clause of the United States Constitution, the laws of the United States are "the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. A state law is preempted and "without effect" if it conflicts with federal law. *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981). A federal law may expressly preempt state law. *See Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Additionally, preemption may be implied if the scope of the statute indicates that Congress intended federal law to occupy the field exclusively or when state law actually conflicts with federal law. *Freightliner Corp. v. Myrick,* 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995) (citing *English v. General Elec. Co.,* 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990)); *see also Moore v. Brunswick Bowling & Billiards Corp.,* 889 S.W.2d 246, 247–48 (Tex.1994). A state law presents an actual conflict with federal law when " 'it is impossible for a private party to comply with both state and federal requirements' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Myrick,* 514 U.S. at 287, 115 S.Ct. 1483 (quoting, respectively, *English,* 496 U.S. at 78–79, 110 S.Ct. 2270, and *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).

Historically, the states have exercised primary authority in matters concerning the public health and safety of their citizens. *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 116 S.Ct. 2240, 2245, 135 L.Ed.2d 700 (1996) (citing *Hillsborough County v. Automated Med. Labs., Inc.,* 471 U.S. 707, 719, 105 S.Ct. 2371,

---

**3.** A number of cases describe the complex history of Standard 208. *See, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 34–38, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Taylor v. General Motors Corp.,* 875 F.2d 816, 823 (11th Cir.1989).

**4.** The Hyundai in which the Alvarados were injured was manufactured on July 12, 1988.

**5.** We note that the Alvarados contend here that the trial court erred in rendering summary judgment because Hyundai did not prove that it complied with any of the performance standards established under Standard 208. In light of our disposition of this appeal, however, we do not decide whether Hyundai proved compliance.

85 L.Ed.2d 714 (1985), and *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 756, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985)). Thus,

> [i]n all pre-emption cases, and particularly in those in which Congress has "legislated . . . in a field which the States have traditionally occupied," . . . [preemption analysis] "start[s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the *clear and manifest purpose* of Congress."

*Medtronic,* 116 S.Ct. at 2250 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)) (emphasis added) (citation omitted). This analytical framework is crucial in our federal system, "[f]or if in close or uncertain cases a court proceeds to preempt state laws where that result was not clearly the product of Congress's considered judgment, the court has eroded the dual system of government that ensures our liberties, representation, diversity, and effective governance." KENNETH STARR *ET AL.,* THE LAW OF PREEMPTION: A REPORT OF THE APPELLATE JUDGES CONFERENCE, AMERICAN BAR ASSOCIATION 40 (1991); *see also Hernandez–Gomez v. Leonardo,* 180 Ariz. 297, 884 P.2d 183, 190 (1994) (noting that a rule requiring explicit indication of preemptive intent "transfers the decision about preemption and its reach from the post-hoc speculation of lawyers to the forum where it should be argued: the legislature, where the competing interests may be reconciled before the statute is passed"), *vacated,* 514 U.S. 1094, 115 S.Ct. 1819, 131 L.Ed.2d 742 (1995). Accordingly, we must consider the Act's language, the context of its enactment, and our "reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law" in order to discern whether Congress manifested a clear intent in the Safety Act to preempt common-law claims. *Worthy v. Collagen Corp.,* 967 S.W.2d 360 (Tex.1998) (quoting *Medtronic,* 116 S.Ct. at 2250–51).

The United State Supreme Court considered the preemptive effect of the Safety Act in *Myrick.* It concluded in that case that the common-law claims at issue were not preempted. 514 U.S. at 286, 289–90, 115 S.Ct. 1483. *Myrick* does not answer the question before us, however, because in that case, no safety standard was in effect. *Id.* at 286, 115 S.Ct. 1483. Consequently, the Court did not reach the argument that section 1392(d) does not preempt common law or address the impact of the Safety Act's savings clause. *Id.* at 287 n. 3, 115 S.Ct. 1483.

A number of other courts, both federal and state, have confronted the issue before us.[6] Some have concluded that the Safety Act preempts claims similar to the Alvarados', and some have held that it does not.[7] While

---

6. Claims of preemption most often arise in cases in which a litigant seeks to hold a manufacturer or vendor liable based upon the failure to include airbags, although many involve challenges almost identical to the Alvarados'. We see no important distinction between no-airbag claims and no-lap belt claims for purposes of our analysis.

7. Cases holding that there is express preemption include *Harris v. Ford Motor Co.,* 110 F.3d 1410 (9th Cir.1997) (airbag); *Zimmerman v. Volkswagen of Am., Inc.,* 128 Idaho 851, 920 P.2d 67 (1996) (lap belt); *Martinez v. Ford Motor Co.,* 224 Mich.App. 247, 568 N.W.2d 396 (1997) (airbag); *Wickstrom v. Maplewood Toyota, Inc.,* 416 N.W.2d 838 (Minn.Ct.App.1987) (airbag); *Panarites v. Williams,* 216 A.D.2d 874, 629 N.Y.S.2d 359 (1995) (airbag); *Gardner v. Honda Motor Co., Ltd.,* 145 A.D.2d 41, 536 N.Y.S.2d 303 (1988) (airbag); *Miranda v. Fridman,* 276 N.J.Super. 20, 647 A.2d 167 (App.Div.1994) (lap belt); *Dykema v. Volkswagenwerk AG,* 189 Wis.2d 206, 525 N.W.2d 754 (App.1994) (lap belt); *Boyle v. Chrysler Corp.,* 177 Wis.2d 207, 501 N.W.2d 865 (App. 1993) (airbag).

For cases holding there is implied preemption, see *Montag v. Honda Motor Co., Ltd.,* 75 F.3d 1414 (10th Cir.1996) (airbag); *Pokorny v. Ford Motor Co.,* 902 F.2d 1116 (3rd Cir.1990) (airbag); *Taylor,* 875 F.2d 816 (airbag) (*but see Doyle v. Volkswagenwerk Aktiengelellschaft,* 114 F.3d 1134 (11th Cir.1997)); *Kitts v. General Motors Corp.,* 875 F.2d 787 (10th Cir.1989) (airbag); *Wood v. General Motors Corp.,* 865 F.2d 395 (1st Cir. 1988) (airbag); *Martinez,* 224 Mich.App. 247, 568 N.W.2d 396 (airbag); *Cooper v. General Motors Corp.,* 702 So.2d 428 (Miss.1997) (airbag); *Cellucci v. General Motors Corp.,* 706 A.2d 806 (Pa.1998) (airbag).

Cases holding there is no preemption include *Doyle,* 114 F.3d 1134 (lap belt); *Munroe v. Galati,* 189 Ariz. 113, 938 P.2d 1114 (1997) (airbag); *Hernandez–Gomez,* 185 Ariz. 509, 917 P.2d 238

the results are not uniform, in the wake of *Cipollone* and *Myrick*, we note that the trend appears to be toward finding no preemption, at least in the state courts. Because the United States Supreme Court has not addressed the particular issue before us, we must independently analyze Hyundai's contention that the Alvarados' claims are preempted based upon the lessons we draw from relevant Supreme Court authority.

## A. Express preemption

■ Section 1392(d) bars states from imposing "any safety standard applicable to the same aspect of performance of such vehicle ... which is not identical to the Federal standard." 15 U.S.C. § 1392(d) (recodified at 49 U.S.C. § 30103(b)). It does not explicitly embrace common-law actions. Nevertheless, in some instances, a federal preemption statute may apply to common-law claims, even if the preemption provision does not use that specific term. *See, e.g., Cipollone,* 505 U.S. at 521–22, 112 S.Ct. 2608.

In *Cipollone,* the Supreme Court considered two express preemption clauses; one precluded states from mandating any "statement" on cigarette labels, while a later amendment of that statute precluded any "requirement or prohibition." *Cipollone,* 505 U.S. at 514–15, 112 S.Ct. 2608. A majority of the Court agreed that the former did not preempt state common-law claims, while a plurality concluded that the latter language did indicate Congress's preemptive intent.[8] *Id.* at 519–21, 523, 112 S.Ct. 2608. *Cipollone* thus teaches us that determining whether Congress demonstrated a "clear and manifest purpose" to preempt common-law actions involves a very statute-specific inquiry. In determining whether Congress evinced a

clear intent in the Safety Act to preempt common-law actions such as the Alvarados', we look first to the preemption clause's language, as well as to its statutory context. *See id.* at 517–19, 112 S.Ct. 2608; *Medtronic,* 116 S.Ct. at 2250.

The Supreme Court's application of these principles in *Medtronic* is instructive. *Medtronic* involved the preemption provision of the Medical Device Amendments of 1976, 21 U.S.C. § 360k(a) ("MDA"), which prohibits states from establishing any "requirement" for a medical device that differs from requirements imposed by the MDA.[9] A plurality of the Supreme Court looked to Congress's repeated use of the term "requirements" throughout the MDA in a manner suggesting that Congress used the word to refer to specific enactments of positive law by legislative or judicial bodies. *Medtronic,* 116 S.Ct. at 2252. In doing so, the plurality assumed, in accordance with controlling canons of statutory construction, that the term had a consistent meaning throughout the MDA. *Cf. Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 568, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995).

In this case, Congress's use of the term "standards" elsewhere in the Safety Act also suggests that Congress intended to preclude the imposition of positive legislative or administrative enactments, rather than general common-law tort duties. As one scholar has noted,

> Under the Traffic Safety Act, federal "motor vehicle safety standards" refers only to regulations promulgated by the Secretary of Transportation. Nowhere does the act mention state law tort claims or other civil damages actions, except in the context of

(lap belt); *Ketchum v. Hyundai Motor Co.,* 49 Cal.App.4th 1672, 57 Cal.Rptr.2d 595 (1996) (lap belt); *Hyundai Motor Co. v. Phillip,* 639 So.2d 1064 (Fla.Dist.Ct.App.1994); *Wilson v. Pleasant,* 660 N.E.2d 327 (Ind.1995) (airbag); *Loulos v. Dick Smith Ford, Inc.,* 882 S.W.2d 149 (Mo.Ct. App.1994) (airbag); *Tebbetts v. Ford Motor Co.,* 140 N.H. 203, 665 A.2d 345 (1995) (airbag); *Drattel v. Toyota Motor Corp.,* 231 A.D.2d 326, 662 N.Y.S.2d 535 (1997) (airbag); *Minton v. Honda of Am. Mfg., Inc.,* 80 Ohio St.3d 62, 684 N.E.2d 648 (1997) (airbag); *Nelson v. Ford Motor Co.,* 108 Ohio App.3d 158, 670 N.E.2d 307 (1995) (airbag). *See also Shipp v. General Motors*

*Corp.,* 750 F.2d 418 (5th Cir.1985) (holding that compliance with federal safety standard did not exempt manufacturer from liability).

8. Justices Blackmun, Kennedy, and Souter would have held that the "requirement or prohibition" language did not preempt common-law actions. *See Cipollone,* 505 U.S. at 531–44, 112 S.Ct. 2608 (Blackmun, J., concurring and dissenting).

9. Notably, the MDA contains no savings clause. Nevertheless, the Court held that the claims in *Medtronic* were not preempted.

the savings provision of § [1397(k)]. That the Traffic Safety Act would use the term "standard" narrowly with respect to federal action and broadly with respect to state action seems highly unlikely.

Robert B. Leflar & Robert S. Adler, *The Preemption Pentad: Federal Preemption of Products Liability Claims After* Medtronic, 64 TENN. L.REV. 691, 734 n.215 (1997).

The Safety Act's language, in light of its history and context, bears out that conclusion. First, Congress defined the term "motor vehicle safety standard" in the Safety Act. 15 U.S.C. § 1391(2) (recodified at 49 U.S.C. § 30102(a)(9)). A safety standard is "a minimum standard for motor vehicle performance ... which is practicable, which meets the need for motor vehicle safety and which provides objective criteria." *Id.* This definition is far removed from a court's or jury's determination that a manufacturer breached a duty of reasonable care or sold a defectively designed product. These determinations may involve some element of practicability. *See Turner v. General Motors Corp.,* 584 S.W.2d 844, 847 (Tex.1979); WILLIAM POWERS, JR., TEXAS PRODUCTS LIABILITY LAW § 5.0233 (2d ed.1994) (noting that products liability claims under both strict liability and negligence standards "evaluate the reasonableness of a risk by weighing its costs against its benefits"). But a tort judgment establishes no "objective criteria"; it simply establishes that a manufacturer or product failed to conform to a generalized standard of care or quality in a specific case. *Cf. Cipollone,* 505 U.S. at 522, 112 S.Ct. 2608 ("Whereas the common law would not normally require a vendor to use any specific statement on its packages or in its advertisements, it is the essence of the common law to enforce duties that are either affirmative requirements or negative prohibitions.").

Other portions of the Safety Act suggest that the express preemption clause does not address the Alvarados' common-law claims. Immediately after the language proscribing the imposition of inconsistent state standards, section 1392(d) goes on to provide that "the United States Government, a State, or a political subdivision of a State may prescribe a *standard* for a motor vehicle or motor vehicle equipment obtained for its own use that imposes a higher performance requirement than that required by the otherwise applicable standard under this chapter." 15 U.S.C. § 1392(d) (recodified at 49 U.S.C. 30103(b)(1)) (emphasis added). This sentence strongly implies that the nonidentical "standards" section 1392(d) prohibits are the kinds of specific, measurable criteria that governmental entities must often adhere to in purchasing goods or services—positive enactments of legislative or administrative bodies—not the duty to use reasonable care or to refrain from selling an unreasonably dangerous product.

Moreover, the national regulatory context in which Congress passed the Safety Act also suggests that Congress did not intend to preempt common-law claims. At the time the Safety Act was passed, a number of states had enacted laws attempting to impose safety requirements on vehicles sold within their borders—specific enactments of positive law. Ralph Nader & Joseph A. Page, *Automobile–Design Liability & Compliance with Federal Standards,* 64 GEO. WASH. L.REV. 415, 423 (1996). Although there had been little enforcement activity under these requirements, *id.,* it seems likely that these are the standards that Congress intended to preempt. *See Cipollone,* 505 U.S. at 519, 112 S.Ct. 2608 (construing preemption provision in light of Act's statement of purpose "[r]ead against the backdrop of regulatory activity undertaken by state legislatures and federal agencies").

This analysis is consistent with the Supreme Court's holding in *Cipollone* that the 1965 Federal Cigarette Labeling and Advertisement Act, barring states from requiring "statements" in cigarette advertising, did not preclude failure-to-warn common-law damage actions. *Cipollone,* 505 U.S. at 518–19, 112 S.Ct. 2608. In reaching that holding, the Court emphasized that the preemption provision, in using the term "statement," clearly referred to the warning statement "required by section 4" of the 1965 act. *Id.* at 518, 112 S.Ct. 2608. In other words, the Court looked to the type of federal action authorized elsewhere in the statute, and reasoned that Congress had intended to bar only that particu-

lar type of activity by the states—positive enactments by legislatures or administrative agencies mandating particular warning labels. *Id.* at 518–19, 112 S.Ct. 2608.

The strongest indication that Congress did not clearly intend to preempt common-law claims such as the Alvarados' is, of course, the Safety Act's savings clause. 15 U.S.C. § 1397(k) (recodified at 49 U.S.C. § 30103(e)). The savings clause is broadly worded—"[c]ompliance with *any* Federal motor vehicle safety standard . . . does not exempt *any* person from *any* liability* under common law." *Id.* In our view, the savings clause would be rendered virtually meaningless if it did not preserve claims such as the Alvarados'. If claims such as the Alvarados' are expressly preempted under section 1392(d) because the Secretary has adopted a standard, then the savings clause preserves only claims that would not be preempted in the first place. *See Pokorny v. Ford Motor Co.,* 902 F.2d 1116, 1120 (3rd Cir.1990); *Taylor v. General Motors Corp.,* 875 F.2d 816, 824 (11th Cir.1989). That result is contrary to our duty, in construing a statute, to give effect to every clause and word. *See American Textile Mfrs. Inst., Inc. v. Donovan,* 452 U.S. 490, 513, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981); *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955).[10]

The Act's legislative history strongly supports the conclusion that the express preemption clause does not extinguish the Alvarados' claims. The House report on the proposed Safety Act stated unequivocally,

> It is intended, and this subsection specifically establishes, that compliance with safety standards is not to be a defense or otherwise to affect the rights of parties under common law particularly those relating to warranty, contract, and tort liability.

H. REP. No. 89–1776, at 24. Similarly, the Senate report provides,

> [T]he Federal minimum safety standards need not be interpreted as restricting State common law standards of care. Compliance with such standards would thus not necessarily shield any person from product liability at common law.

S.REP. No. 89–1301, *reprinted in* 1966 U.S.C.C.A.N. at 2720.

In addition to the House and Senate committee reports, numerous statements in the Safety Act's legislative history leave little doubt that Congress intended to preserve all common-law claims. For example, Senator Magnuson, one of the Safety Act's congressional sponsors, remarked that "[c]ompliance with Federal standards would not necessarily shield any person from broad liability at the common law. The common law on product liability still remains as it was." 112 CONG. REC. 14,230 (daily ed. June 24, 1966) (statement of Sen. Magnuson). In the House, the representative from Michigan, Representative Dingell, said,

> [W]e have preserved every single common-law remedy* that exists against a manufacturer for the benefit of a motor vehicle purchaser. This means that all of the warranties and *all of the other devices of common law which are afforded to the purchaser, remain in the buyer, and they can be exercised against the manufacturer.*

112 CONG. REC. 19,663 (daily ed. Aug. 17, 1966) (statement of Rep. Dingell) (emphasis added).

In light of the language of the Safety Act's express preemption clause, the savings clause, and the statute's legislative history, we do not perceive a "clear and manifest" intent on Congress's part to preempt the Alvarados' claims. *See CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) (quoting *Rice,* 331 U.S. at 230). Accordingly, we hold that the Alvarados' claims are not expressly preempted.

---

**10.** Some courts have concluded that the savings clause is intended to demonstrate that Congress has not occupied the entire field of motor vehicle safety. *See, e.g, Montag v. Honda Motor Co., Ltd.,* 856 F.Supp. 574, 577 (D.Colo.1994), *aff'd on other grounds,* 75 F.3d 1414 (10th Cir.1996);

*Cooper,* 702 So.2d at 437. But the Safety Act's express preemption clause itself shows that Congress has not occupied the field; it leaves states free to impose their own standards when no standard is in place. *See Myrick,* 514 U.S. at 286, 115 S.Ct. 1483.

## B. Implied preemption

In *Cipollone*, the Supreme Court noted that

[w]hen Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a "reliable indicium of congressional intent with respect to state authority," "there is no need to infer congressional intent to pre-empt state laws from the substantive provisions" of the legislation. Such reasoning is a variant of the familiar principle of expressio unius est exclusio alterius: Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted.

505 U.S. at 517, 112 S.Ct. 2608 (citations omitted) (quoting, respectively, *Malone v. White Motor Corp.*, 435 U.S. 497, 505, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978), and *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 282, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987)). This language led a number of courts to conclude that, under *Cipollone*, an express preemption clause forecloses implied preemption. *See, e.g., Myrick v. Freuhauf Corp.*, 13 F.3d 1516, 1521 (11th Cir.1994), *aff'd sub nom. Freightliner Corp. v. Myrick*, 514 U.S. 280, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995); *Loulos v. Dick Smith Ford, Inc.*, 882 S.W.2d 149, 151 (Mo.Ct.App.1994); *Hernandez–Gomez*, 884 P.2d at 190. But in *Myrick*, the Court explained that *Cipollone* announced no absolute rule. *Myrick*, 514 U.S. at 288–89, 115 S.Ct. 1483. Instead, "[a]t best, *Cipollone* supports an inference that an express pre-emption clause forecloses implied pre-emption." *Id.* at 289, 115 S.Ct. 1483.

After *Myrick*, some courts have concluded that the Act's express preemption clause, read in conjunction with the Act's savings clause, reliably indicates that Congress did not intend to foreclose common-law claims based upon the lack of a lap belt or airbag. *See, e.g., Hernandez–Gomez*, 917 P.2d at 243 (noting that it is possible the Act's savings clause categorically precludes preemption, but proceeding with implied preemption anal-

ysis because the Supreme Court had not addressed the issue); *Wilson v. Pleasant*, 660 N.E.2d 327, 336 (Ind.1996) (holding that Act's savings clause "entirely forecloses any possibility of implied pre-emption," but proceeding with implied preemption analysis as the safer course). Like the Arizona and Indiana courts, we believe that it is likely that the Act's savings clause forecloses the possibility of implied preemption in this case. Nevertheless, like those courts, we "take the jurisprudentially safer course and proceed with an implied preemption analysis." *Hernandez–Gomez*, 917 P.2d at 243 (citing *Wilson*, 660 N.E.2d at 336–37).

As we have observed, federal law may impliedly preempt state law when the scope of a statute indicates that Congress intended to occupy a field exclusively (field preemption), or when state law actually conflicts with federal law (obstacle preemption), either because it is " 'impossible for a private party to comply with both state and federal requirements,' " or because "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Myrick*, 514 U.S. at 287, 115 S.Ct. 1483 (quoting *English*, 496 U.S. at 78–79, 110 S.Ct. 2270, and *Hines*, 312 U.S. at 67, 61 S.Ct. 399). We examine each of these potential preemptive avenues in turn.

### 1. Field preemption

■ Field preemption may occur when "[t]he scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Rice*, 331 U.S. at 230, 67 S.Ct. 1146 (citing *Pennsylvania R.R. Co. v. Public Serv. Comm'n*, 250 U.S. 566, 569, 40 S.Ct. 36, 63 L.Ed. 1142 (1919)). It may also occur when "the Act of Congress ... touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.* (citing *Hines*, 312 U.S. at 61, 61 S.Ct. 399).

■ We are aware of no court that has concluded that Congress intended to occupy the entire field of vehicle safety. Vehicle safety significantly differs from the areas

that have been found to involve peculiarly federal interests, such as the liability of federal officials, *Johnson v. Maryland,* 254 U.S. 51, 41 S.Ct. 16, 65 L.Ed. 126 (1920), or international relations, *see Hines,* 312 U.S. 52, 61 S.Ct. 399. And the scope of the statute persuades us that Congress has not pervasively regulated the field. By limiting the Act's express preemption clause to instances in which the Secretary has adopted a safety standard, Congress implicitly left the states free to enforce their own standards in the interstices. *See* 15 U.S.C. § 1392(d) (recodified at 49 U.S.C. § 30103(b)).

Moreover, the standard adopted by the Secretary under which Hyundai proceeded is not comprehensive. It did not mandate a particular design and provided no performance standard for rollover accidents. *See* 49 C.F.R. § 571.208, S4.1.2.2, S4.5.3. Thus, to the extent Standard 208 defines the preemptive reach of the Safety Act, it "is not a comprehensive regulation that occupies the entire field. Rather, it covers only crash worthiness standards applicable to particular aspects of vehicle or vehicle equipment performance." *Hernandez–Gomez,* 917 P.2d at 245.

Certain language in *Myrick* reinforces our conclusion that the Safety Act does not occupy the entire field of vehicle safety. The Court distinguished a case that had held that the failure of federal officials to affirmatively exercise their authority amounted to a determination that no regulation was warranted. *Myrick,* 514 U.S. at 286, 115 S.Ct. 1483 (distinguishing *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978)). *"Unlike this case,* however, we found in *Ray* that Congress intended to centralize all authority over the regulated area in one decision-maker." *Id.* (emphasis added). We cannot conclude that Congress has pervasively regulated this area. Accordingly, we hold that the Safety Act does not preempt the entire field of vehicle safety.

### 2. Obstacle preemption

■ A state law may be preempted when it is impossible to comply with both the federal and state requirement. *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963). There is no such impossibility here. It is not impossible for Hyundai to comply both with federal law and with a state common-law duty to include lap belts. The regulations promulgated under the Safety Act did not preclude Hyundai from installing lap belts. The safety standards themselves specify that lap belts combined with shoulder belts may be used to meet applicable crash protection requirements. 49 C.F.R. § 571.208, S4.1.2.3.

Nor is it impossible for Hyundai to comply with federal law and at the same time to respond in damages for breach of common-law duties. *See Perry,* 957 F.2d at 1264 ("If a manufacturer is held liable in tort for not designing its system to provide protection greater than that required by the federal standard, the manufacturer can still comply with both the federal standard and the state tort standard by designing its system to meet the latter."). As the Arizona Supreme Court observed in *Hernandez–Gomez,* "[m]anufacturers may weigh the risks and benefits and choose to live with the occasional lawsuit rather than change their behavior." 917 P.2d at 248; *cf. Cipollone,* 505 U.S. at 518, 112 S.Ct. 2608 ("[T]here is no general, inherent conflict between federal pre-emption of state warning requirements and the continued vitality of state common-law damages actions."). Common-law damage claims can be distinguished from a state statute or regulation that would prohibit Hyundai from taking action that federal law expressly permits. *Cf. Florida Lime & Avocado Growers,* 373 U.S. at 141–42, 83 S.Ct. 1210; *Hernandez–Gomez,* 917 P.2d at 247.

A federal law may also preempt state law when the state law " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Myrick,* 514 U.S. at 287, 115 S.Ct. 1483 (quoting *Hines,* 312 U.S. at 67, 61 S.Ct. 399). Thus, we must identify Congress's purposes and objectives in enacting the Act.

It is indisputable that Congress's overriding purpose in passing the Safety Act was to reduce traffic deaths and injuries caused by traffic accidents. The Safety Act expressly and unequivocally states that purpose:

Congress hereby declares that the purpose of [the Act] is to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents. Therefore, Congress determines that it is necessary to establish motor vehicle safety standards for motor vehicles and equipment in interstate commerce; to undertake and support necessary safety research and development; and to expand the national driver register.

15 U.S.C. § 1381 (recodified at 49 U.S.C. § 30101). Likewise, the purpose of Standard 208 is "to reduce the number of deaths of vehicle occupants, and the severity of injuries." 49 C.F.R. § 571.208, S2. Allowing the Alvarados' claims to proceed is entirely consistent with that purpose.

The Act's legislative history abundantly demonstrates the dominance of that purpose. *See, e.g.,* S.REP. No. 89–1301, *reprinted in* 1966 U.S.C.C.A.N. at 2714; H. REP. No. 89–1776, at 10–11. The statement of Senator Magnuson, one of the Act's sponsors, is typical of the views expressed by various members of Congress:

It should not be necessary to call again the grim roll of Americans lost and maimed on the Nation's highways. Yet the compelling need for the strong automobile safety legislation which the Commerce Committee is today reporting lies embodied in those statistics: 1.6 million dead since the coming of the automobile; over 50,000 to die this year. And, unless the accelerating spiral of death is arrested, 100,000 Americans will die as a result of their cars in 1975.

112 CONG. REC. 14,221 (daily ed. June 24, 1966) (statement of Sen. Magnuson).

The Act's savings clause and its history show that another of Congress's purposes was to preserve common-law claims in accomplishing its primary objective. As we have noted, the savings clause is broad, providing that compliance with federal safety standards "does not exempt any person from any liability under common law." 15 U.S.C. § 1397(k) (recodified at 49 U.S.C. § 30103(e)). House Report 89–1776, quoted above, demonstrates Congress's strong intent not "to affect the rights of parties under common law." H. REP. No. 89–1776, at 24.

As the Fifth Circuit has noted, "Congress sought to meet its goal of minimizing the number of deaths and injuries caused by auto accidents by setting forth minimum standards *and* leaving common law liability in place." *Perry,* 957 F.2d at 1265–66 (emphasis added).

Another of Congress's purposes was to foster innovation and competition in vehicle safety. The Senate committee report remarked, "[T]his legislation reflects the faith that the restrained and responsible exercise of Federal authority can channel the creative energies and vast technology of the automobile industry into a vigorous and competitive effort to improve the safety of vehicles." S.REP. No. 89–1301, *reprinted in* 1966 U.S.C.C.A.N. at 2709. Accordingly, Congress characterized the standards to be adopted by the Secretary as "minimum[s]." 15 U.S.C. § 1391(2) (" 'Motor vehicle safety standards' means a *minimum* standard for motor vehicle performance, or motor vehicle equipment performance.") (recodified at 49 U.S.C. § 30102(a)(9)). Consistent with Congress's intent to kindle innovation, manufacturers are free to do more than the standards require. *See Perry,* 957 F.2d at 1265–66. Allowing the imposition of tort liability is not inconsistent with Congress's desire to encourage innovation.

Some courts have concluded that allowing state tort claims would frustrate a congressional purpose of uniformity, or deprive a manufacturer of a choice that Congress intended it to have. *See, e.g., Wood v. General Motors Corp.,* 865 F.2d 395, 412 (1st Cir. 1988); *Pokorny,* 902 F.2d at 1123. The Fifth Circuit, quoting the Third Circuit, declined to elevate what it described as a "secondary goal" of uniformity over the Safety Act's "primary goal" of reducing deaths and injuries:

[U]niformity was not Congress's primary goal in enacting the Safety Act. In 15 U.S.C.A. § 1381, Congress declared that the Safety Act's purpose was "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." Congress evidently thought that preserving common law liability would further the goal of motor vehicle safety, since

§ 1397(k) was included as part of the Act. In the face of this clear declaration of congressional purpose, we are unwilling to accept an overly broad notion of preemption based on uniformity that could have the effect of undercutting Congress's concern for safety.

[*Pokorny*,] 902 F.2d at 1122. We agree with the Third Circuit, and refuse to reject the Savings Clause in favor of Congress' secondary goal of uniformity. We thus find that Perry's state law clam for defective design of an air bag system does not create an actual conflict with the Safety Act and its underlying regulatory scheme.

*Perry*, 957 F.2d at 1266 (citations omitted).

We also decline to elevate a "secondary purpose" so as to frustrate Congress's primary purpose. Similarly, we do not believe that the secondary goal of providing manufacturers with a choice outweighs the primary goal of reducing deaths and injuries. As we have observed, the imposition of common-law liability does not impose any particular safety standard upon a manufacturer; the manufacturer may choose to comply with the minimum federal standards and bear tort liability as a cost of doing business. *See Perry*, 957 F.2d at 1265 ("We recognize that the manufacturer who chooses to meet only the bare minimum performance requirements will be burdened with the potential for tort liability, but this is the exact burden that Congress preserved in the Savings Clause."); *cf. Florida Lime & Avocado Growers*, 373 U.S. at 147–48, 83 S.Ct. 1210 (emphasizing statute's reference to "minimum standards" in concluding that statute did not "reveal a design that federal marketing orders should displace all state regulations").

Finally, Hyundai argues that certain actions by Congress indicate that the Safety Act preempts common-law claims. In 1991, Congress passed the Intermodal Surface Transportation Efficiency Act, a massive highway funding bill. *See* Pub.L. No. 102–240, 105 Stat.1914 (codified as amended in scattered sections of 49 U.S.C.). Part B of the bill amended the Safety Act; among other things, it commanded the Secretary to amend Standard 208 to require automakers to install airbags. *Id.* § 2508, 105 Stat. at 2084. Section 2508(d) of that legislation provides:

Nothing in this section shall be construed by the Secretary or any other person, including any court, as altering or affecting any other provision of law administered by the Secretary and applicable to such passenger cars or trucks, buses, or multipurpose passenger vehicles or as establishing any precedent regarding the development and promulgation of any Federal Motor Vehicle Safety Standard. Nothing in this section or in the amendments made under this section to Federal Motor Vehicle Safety Standard 208 shall be construed by any person or court as indicating an intention by Congress to affect, change, or modify in any way the liability, if any, of a motor vehicle manufacturer under applicable law relative to vehicles with or without inflatable restraints.

*Id.*, 105 Stat. at 2085–86. According to Hyundai, this provision reflects Congress's intent to endorse the cases that had held that the Safety Act preempts common-law claims. From this, Hyundai asserts, we should infer that the 1966 Safety Act preempts the Alvarados' claims.

For two reasons, we cannot make that leap. First, the section's plain language and its legislative history suggest that Congress's intent was to ensure that the 1991 amendments did not in any way affect automakers' liability. The House Report on the bill specifically states that "[t]his section is not intended to be a 'sword' or a 'shield' in litigation or otherwise." H. REP. No. 102–171(I), *reprinted in* 1991 U.S.C.C.A.N. 1526, 1783. Nevertheless, Hyundai invites us to rely upon section 2508(d) to shield it from liability here.

If Congress intended section 2508(d) to make any statement about preemption, it chose a singularly obscure means of doing so. Congress could simply have amended the Safety Act's express preemption clause to forthrightly state that the preempted "standards" include common-law liability findings, but it did not. The only clear meaning that we can infer from section 2508(d) is that Congress intended not to change the law, whatever the law might have been. Al-

though the majority of cases addressing the preemptive effect of the Safety Act at that time had found preemption, that view was not unanimous. *See, e.g., Garrett v. Ford Motor Co.,* 684 F.Supp. 407 (D.Md.1987) (no preemption); *Murphy v. Nissan Motor Corp.,* 650 F.Supp. 922 (E.D.N.Y.1987) (same); *Gingold v. Audi–NSU–Auto Union, A.G.,* 389 Pa.Super. 328, 567 A.2d 312 (1989) (same). In addition, a number of other cases had reached conclusions similar to that of the Eighth Circuit in the premiere crash worthiness case, *Larsen v. General Motors Corp.,* 391 F.2d 495, 506 (8th Cir.1968): "It is apparent that the National Traffic Safety Act is intended to be supplementary of and in addition to the common law of negligence and product liability.... The Act is ... not an exemption from common law liability." *See also Shipp v. General Motors Corp.,* 750 F.2d 418, 421 (5th Cir.1985); *Sours v. General Motors Corp.,* 717 F.2d 1511, 1517 (6th Cir. 1983); *Ellis v. K–Lan Co., Inc.,* 695 F.2d 157, 161 (5th Cir.1983). Clearly, the state of the law regarding the effect of the Safety Act on common-law liability was not uniform as of 1991.

More importantly, even if Congress's intent in section 2508(d) were clear, we cannot impute that intent to the Congress of 1966. "[I]t is well settled that ' "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." ' " *Russello v. United States,* 464 U.S. 16, 26, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (quoting *Jefferson County Pharmaceutical Ass'n v. Abbott Labs.,* 460 U.S. 150, 165 n. 27, 103 S.Ct. 1011, 74 L.Ed.2d 882 (1983) (quoting *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960))). *See also United States v. Clark,* 445 U.S. 23, 33 n. 9, 100 S.Ct. 895, 63 L.Ed.2d 171 (1980).

The Supreme Court has mandated that courts "are not to conclude that Congress legislated the ouster of [state law] ... in the absence of an *unambiguous* congressional mandate to that effect." *Florida Lime & Avocado Growers,* 373 U.S. at 146–47, 83 S.Ct. 1210 (emphasis added). The Safety Act's language, context, and legislative history reveal no such unequivocal precept. Ac-

cordingly, we hold that the Alvarados' no-lap belt claims are not impliedly preempted.

\* \* \*

In summary, we hold that the Alvarados' claims based upon the manufacturer's failure to install lap belts are neither expressly nor impliedly preempted. Accordingly, we affirm the judgment of the court of appeals and remand the case to the trial court for further proceedings.

OWEN, Justice, filed a dissenting opinion, in which PHILLIPS, Chief Justice, HECHT and ENOCH, Justices, joined.

OWEN, Justice, joined by PHILLIPS, Chief Justice, and HECHT and ENOCH, Justices, dissenting.

Fundamentally, the issue in this case is whether Congress intended in the National Traffic and Motor Vehicle Safety Act of 1966 to leave the decision as to what occupant restraints should be provided in vehicles to the Secretary of Transportation or to leave that decision to juries across America. Not surprisingly, a solid majority of the courts to consider this issue have held that Congress intended that the Secretary make this determination. The issue of what safety restraints should be required demands a balancing of many considerations that Congress concluded was more appropriately accomplished at the federal level with intense scrutiny and study of restraint systems.

In spite of the Safety Act's mandate that, whenever a safety standard for motor vehicles is in effect, no State shall have any authority to establish a standard that is not identical to the federal one, the Court holds that a state may impose common-law tort liability on a manufacturer for failing to do more than the federal regulations require. The Court's decision relies in part on a general savings clause in the statute, even though the United States Supreme Court has held that similar clauses do not supersede express preemption provisions like the one in the Safety Act. The Court also supports its rejection of preemption based on a one-sided discussion of the history and purpose of the Act. The Court has failed to consider the

extensive proceedings of the federal government that led to the safety standards that regulate vehicle occupant restraint systems, including the authorization of two-point restraint systems like the one at issue in this case. Finally, the Court has made no attempt to distinguish its decision today from our unanimous decision in *Worthy v. Collagen Corp.*,[1] decided just four months ago, in which we held that a federal statute regulating the safety of medical devices preempted common-law damage claims when the device had been scrutinized by the federal government and specific regulations applied.

Because I am persuaded by the reasoning of four of the five federal circuit courts to decide the issue[2] and three courts of last resort of other states,[3] which have held that no-lap-belt or no-airbag claims are preempted, I respectfully dissent.

## I

The Excel from which Mario Alvarado was ejected when it rolled over was equipped with a two-point passive restraint system. A shoulder belt automatically moved into place across the passenger's chest when the vehicle's door closed, and a ramp seat and knee bolster helped keep the passenger in the seat in the event of a crash. The system was "passive" because the occupant did nothing to activate it. This two-point assembly did not include a lap belt. The Alvarados assert that if a lap belt had been part of the restraint system, Mario would have remained

inside the Excel. Hyundai contends, and the trial court held, that the Alvarados' no-lap-belt claims are preempted by the National Traffic and Motor Vehicle Safety Act of 1966, formerly 15 U.S.C. §§ 1381–1431, and regulations promulgated thereunder.[4]

When Congress enacted the Safety Act, it empowered the Secretary of the Department of Transportation to establish "appropriate Federal motor vehicle safety standards."[5] Congress directed that "[e]ach such Federal motor vehicle safety standard shall be practicable [and] shall meet the need for motor vehicle safety."[6] Congress also included an express preemption provision. Once the Secretary has established a standard, the States are prohibited from imposing a safety standard that is "not identical to the Federal standard."[7]

At the time Hyundai manufactured the Excel in which Mario Alvarado was injured, automakers had specific options, most of which required lap belts.[8] However, if Hyundai met certain performance requirements, the federal regulations permitted it to furnish a fully automatic seat belt system that did not include lap belts.[9] The particulars of these regulations are considered in detail below. The question presented in this case is whether the Safety Act and the regulations under it preempt not only state statutes and regulations from imposing any additional requirements on restraint systems but also common-law damage claims if the manufacturer chose an option permitted by the

---

1. 967 S.W.2d 360 (Tex.1998).

2. *See Harris v. Ford Motor Co.*, 110 F.3d 1410 (9th Cir.1997) (airbag); *Montag v. Honda Motor Co.*, 75 F.3d 1414 (10th Cir.) (airbag), *cert. denied,* —— U.S. ——, 117 S.Ct. 61, 136 L.Ed.2d 24 (1996); *Pokorny v. Ford Motor Co.*, 902 F.2d 1116 (3d Cir.) (airbag), *cert. denied,* 498 U.S. 853, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990); *Kitts v. General Motors Corp.*, 875 F.2d 787 (10th Cir. 1989) (airbag), *cert. denied,* 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990); *Wood v. General Motors Corp.*, 865 F.2d 395 (1st Cir. 1988) (airbag), *cert. denied,* 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 782 (1990).

3. *See Zimmerman v. Volkswagen of Am., Inc.*, 128 Idaho 851, 920 P.2d 67 (1996) (lap belt), *cert. denied,* —— U.S. ——, 117 S.Ct. 1245, 137 L.Ed.2d 327 (1997); *Cooper v. General Motors Corp.*, 702 So.2d 428 (Miss.1997) (airbag); *Cel-*

*lucci v. General Motors Corp.*, 706 A.2d 806 (Pa. 1998) (airbag).

4. As the Court explains, *see* 974 S.W.2d at 2 n. 1, the Safety Act was reorganized and moved to chapter 49 of the United States Code in 1994. *See* Pub.L. No. 103–272, 108 Stat. 745 (1994). In the interest of consistency, I refer to the pre–1994 statutes as the Court, court of appeals, and parties have done.

5. 15 U.S.C. § 1392(a).

6. *Id.*

7. *Id.* § 1392(d).

8. *See* 49 C.F.R. § 571.208.

9. *Id.*

federal regulations. There is a considerable body of law regarding federal preemption of state common-law claims by statutes similar to the Safety Act, which indicates that the answer to that question is "yes." However, before I turn to a discussion of that law, it is illuminating to consider the extensive history of federal regulation of occupant restraint systems and the detailed regulations that apply to Hyundai.

## II

The Court concludes that the regulations did not tell Hyundai what type of design to use but instead only established performance requirements under four different options.[10] The Court also observes that there were no performance requirements for rollovers under the particular option chosen by Hyundai.[11] These assertions are misleading, and they oversimplify and misconstrue a complex, detailed regulatory scheme that expressly allowed Hyundai to choose not to meet rollover requirements if it met other crash protection requirements.

The regulations that governed restraint systems were quite specific, not the general type of regulation found to have no preemptive effect by the United States Supreme Court in *Medtronic, Inc. v. Lohr.*[12] In *Medtronic,* the Supreme Court distinguished general regulations from specific ones, taking into account the extent to which the federal government had balanced competing considerations:

> The generality of these requirements make this quite unlike a case in which the Federal Government has weighed the competing interests relevant to the particular requirement in question, reached an unambiguous conclusion about how those competing considerations should be resolved in a particular case or set of cases, and implemented

that conclusion via a specific mandate on manufacturers or producers.[13]

The federal regulations at issue here were implemented after federal lawmakers carefully weighed alternatives, and the regulations embody detailed requirements. The safety standards applicable to the Excel's restraint system are found at 49 C.F.R. § 571.208 (1988), sometimes called Federal Motor Vehicle Safety Standard (FMVSS) 208. The stated purpose of FMVSS 208 is to "specif[y] performance requirements for the protection of vehicle occupants in crashes."[14] The federal regulations accomplish this purpose by "specifying vehicle *crashworthiness* requirements in terms of forces and accelerations measured on anthropomorphic dummies in test crashes, *and by specifying equipment requirements for active and passive restraint systems.*"[15]

The issue of what particular types of passenger restraints should be required under federal law is longstanding and has commanded the sustained attention of the Secretary of the Department of Transportation, the National Highway and Safety Transportation Administration (NHTSA), and at times, the attention of Congress. The standard at issue, FMVSS 208, was first promulgated in 1967 and required all automobiles to have manual lap belts.[16]

The regulation was amended in 1972 to require a gradual phase-in of passive restraints because so many members of the public failed to "buckle up."[17] An option available for cars manufactured before 1975 was an ignition interlock system that prevented the car from starting unless the manual seatbelts were fastened. Public outcry led Congress to amend the Safety Act in 1974 to prohibit the use of the ignition interlock system or the use of a continuous buzz-

---

**10.** *See* 974 S.W.2d at 9.

**11.** *See id.*

**12.** 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996).

**13.** *Id.* at 501, 116 S.Ct. 2240; *see also Harris v. Ford Motor Co.,* 110 F.3d 1410, 1414 (9th Cir. 1997).

**14.** 49 C.F.R. § 571.208, S1.

**15.** *Id.* § 571.208, S2 (emphasis added).

**16.** 32 Fed.Reg. 2415 (1967).

**17.** *See* FMVSS, 37 Fed.Reg. 3911.

er.[18] In that same amendment Congress also responded to concerns of the public about mandated airbags and other automatic passive restraint systems. Congress prohibited the Secretary from adopting a safety standard that would require a manufacturer to meet that standard by means other than a "belt system," which was defined in the Act as an integrated lap and shoulder belt system for the front passenger seat, unless the regulation was submitted to Congress and was not vetoed.[19] Congress thereby ensured that the manual seatbelt system that was then familiar to the public would not be abolished and replaced with a passive restraint system without an opportunity for Congress to say "no." In so doing, Congress indicated that it was balancing the safety benefits of what might be safer types of systems against the public's sensibilities and concerns. These enactments also indicated Congress's concern that the public would disable restraint systems if they were too intrusive or controversial, which would leave the passenger with no protection.

By the time the 1988 Hyundai involved in this litigation was manufactured, FMVSS 208 had again been revised to phase in passive restraint systems and to require passive restraint systems in all automobiles manufactured after September 1, 1989.[20] Congress ultimately amended the Safety Act in 1991 to require airbags combined with lap and shoulder belts in all new automobiles.[21]

In adopting the regulations that applied to the Excel in which Mario Alvarado was injured, the Secretary of Transportation considered various options at some length.[22] The Secretary was cognizant that a two-point restraint like the one employed by Hyundai might not prevent ejection in a rollover, but the Secretary nevertheless permitted use of the two-point system:

[R]ecent research by the Canadian Government has indicated that the absence of a lap belt may result in the 2–point automatic belt being less effective in preventing ejection. In addition, the door mounted, 2–pointed belt may have little capability of preventing ejection of an occupant in the event of an accidental door opening during a collision. However, even a 3–point automatic belt will not prevent all fatalities involving ejection, since some fatalities occur as a result of impacting interior components before ejection, while others occur as a result of occupant contact with objects outside the vehicle after partial ejection. Moreover, the door mounted belt in the 2–point system may actually prevent door openings in many instances, since the "loading" of the belt (which is attached to the door) can tend to keep the door closed during a crash.

Three-point automatic belts should be as effective as manual belts, and the Department's estimates for effectiveness of automatic belts reflect this. Automatic belt effectiveness estimates have been adjusted downward by 5 percent at the lower end of the range because there is some evidence that 2–point belts may be less effective than 3–point belts.[23]

At other junctures in the promulgation of this final rule, the Secretary again noted that lap belts were necessary for protection in rollovers. "To attain protection in these nonfrontal [rollover or rear-end] crashes, a lap belt, or lap/shoulder belt must be worn." [24] But the Secretary also recognized that seatbelts could result in more severe injuries in some types of crashes:

Airbags with lap belts also provide protection at higher speeds than safety belts do, and they will provide better protection against several kinds of extremely debilitating injuries (e.g., brain and facial inju-

**18.** 15 U.S.C. § 1410b(b)(1)(1982) (repealed 1994).

**19.** Id. §§ 1410b(b)(2), 1410b(f)(2); see also Pokorny v. Ford Motor Co., 902 F.2d 1116, 1123–24 (3d Cir.), cert. denied, 498 U.S. 853, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990).

**20.** See 49 Fed.Reg. 28962, 28963.

**21.** See 49 U.S.C. § 30127(b) (1997).

**22.** See FMVSS, 49 Fed.Reg. 28962.

**23.** Id. at 28985.

**24.** Id. at 28991.

ries) than safety belts. They also generally spread the impact of a crash better than seatbelts, which are more likely to cause internal injuries or broken bones in the areas of the body where they restrain occupants in severe crashes.[25]

The Secretary further considered the relative merits of detachable and nondetachable automatic seatbelts but did not mandate either, recognizing that both had benefits and drawbacks.[26] While the usage rate for nondetachable automatic seatbelts might be higher, the Secretary reasoned, there were a myriad of countervailing concerns. Some passengers would find nondetachable automatic seatbelts "uncomfortable, cumbersome and obtrusive" and "[o]thers will fear entrapment."[27] The Secretary concluded that this "might hamper automobile sales" and that, in an emergency, some might find nondetachable belts "harder to get out of."[28] The Secretary observed that the "most serious concern" was that "the public's dislike of them may lead to defeat of the system (e.g., by cutting the belt)."[29] The Secretary was also concerned that mandating nondetachable belts would force manufacturers to eliminate the middle front seat because there was no commercially-developed technology to provide an automatic seat belt for the center seat and that nondetachable belts made it difficult to install a child restraint seat properly.[30] On the other hand, the drawback of detachable automatic belts was that passengers would detach and not use them.[31]

Similarly, the Secretary weighed the potential effectiveness of airbags in many types of crashes against the potential for injury to "out of position" passengers (children) when an airbag deployed.[32] The Secretary neither mandated nor prohibited the use of airbags, but instead recognized that they could be used in meeting the requirements of the regulations at the option of the manufacturer.

In reviewing this history, I do not mean to imply that common-law claims alleging defective design because an airbag did not include a sensor to detect a child or similar claims are or are not preempted.[33] Those issues are not before the Court. The point in recounting these considerations is to illustrate that federal lawmakers consciously weighed the various options and expressly permitted manufacturers to choose one type of restraint system over another within certain limits. The two-point system used by Hyundai was expressly contemplated as an option for restraining passengers. The Supreme Court's decision in *Gade v. National Solid Wastes Management Association,* teaches us that preemption analysis should turn on whether the federal and state laws " 'operate on the same object.' "[34] The common-law claims alleged by the Alvarados "operate on the same object" as the Safety Act and federal regulations—the safety standards for occupant restraint systems. The extensive history of federal regulation of restraint systems strongly indicates preemption.

### III

Preemption of state law has its genesis in the Supremacy Clause of the United States Constitution, which provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary

25. *Id.*

26. *Id.* at 28992.

27. *Id.*

28. *Id.*

29. *Id.* at 28993.

30. *Id.*

31. *Id.*

32. *See id.* at 28992, 29001.

33. *Cf. Bammerlin v. Navistar Int'l Transp. Corp.,* 30 F.3d 898 (7th Cir.1994) (holding no preemption of a claim that the belt system in a large tractor-trailer truck was defectively designed because it was attached to the engine housing); *Perry v. Mercedes Benz of N. Am., Inc.,* 957 F.2d 1257 (5th Cir.1992) (holding claim that airbag was defective because it did not inflate was not preempted).

34. 505 U.S. 88, 106, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) (quoting *Napier v. Atlantic Coast Line R.R.. Co.,* 272 U.S. 605, 612, 47 S.Ct. 207, 71 L.Ed. 432 (1926)).

notwithstanding." [35]   A state law is preempted and "without effect" if it conflicts with federal law.[36]   The Supreme Court concluded in *Medtronic* that the scope of preemption is informed by two principles.[37]   The first is the presumption that Congress does not cavalierly preempt state-law causes of action, particularly when Congress has legislated in a field traditionally occupied by the States.[38]   Such an approach is "consistent with both federalism concerns and the historic primacy of state regulation of matters of health and safety." [39]   The second principle is that the intent of Congress, which is the " 'ultimate touchstone' in every preemption case," [40] is determined from the structure and purpose of the statute as a whole not only as revealed in the text "but [also] through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." [41]

Preemption may be express,[42] or it may be implied if the scope of the statute indicates that Congress intended federal law to occupy the field exclusively or when state law is in actual conflict with federal law.[43]   At times, it may be difficult to discern if the preemptive effect of a statute is express or implied.   In *Gade v. National Solid Wastes Management Ass'n,*[44] a plurality of the United States Supreme Court found implied preemption, while Justice Kennedy concluded in a concurring opinion that there was express preemption.   The plurality observed that, when the text of a statute strongly evinces an intent to preempt, it is often less important whether the preemption is denominated "express" or "implied":

> Frequently, the preemptive "label" we choose will carry with it substantive implications for the scope of pre-emption.   In this case, however, it does not.   Our disagreement with Justice Kennedy as to whether the OSH Act's preemptive effect is labeled "express" or "implied" is less important than our agreement that the implications of the text of the statute evince a congressional intent to pre-empt nonapproved state regulations when a federal standard is in effect.[45]

The "implications of the text" of the Safety Act unmistakably reflect that some state laws are preempted.   The express preemption clause provides:

> Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard.   Nothing in this section shall be construed as preventing any State from enforcing any safety standard which is identical to a Federal safety standard.[46]

However, the Safety Act also contains a savings clause that explicitly refers to common-law claims: "Compliance with any Federal motor vehicle safety standard issued under

---

35.   U.S. Const. art.  VI, cl. 2.

36.   *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981).

37.   518 U.S. at 485, 116 S.Ct. 2240.

38.   *Id.*

39.   *Id.*

40.   *Id.*

41.   *Id.* at 486, 116 S.Ct. 2240.

42.   *See Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).

43.   *Freightliner Corp. v. Myrick,* 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995) (citing *English v. General Elec. Co.,* 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990)); *see also Moore v. Brunswick Bowling & Billiards Corp.,* 889 S.W.2d 246, 247–48 (Tex.1994).

44.   505 U.S. 88, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992).

45.   *Id.* at 104 n. 2, 112 S.Ct. 2374.

46.   15 U.S.C. § 1392(d).

this subchapter does not exempt any person from any liability under common-law." [47]

The United States Supreme Court had occasion to consider the preemptive provisions of the Safety Act in *Freightliner Corp. v. Myrick*,[48] but that decision left open two of the key issues in this case: 1) whether the term "standard" in the Act preempts only state statutes and regulations and not common-law claims; and 2) the effect of the savings clause on state common-law liability.[49] In *Myrick*, plaintiffs in two separate suits contended that tractor-trailers were negligently designed because they were not equipped with antilock braking systems (ABS).[50] Federal safety regulations had been promulgated that imposed stopping distances which, as a practical matter, could only be met by the use of ABS devices. However, prior to the collisions in these cases, that federal safety standard had been suspended by the Ninth Circuit Court of Appeals because " 'there [was] a strong probability that [ABS] has created a potentially more hazardous highway situation than existed before the Standard became operative.' " [51] The standard was not thereafter reinstated by the regulatory authorities. The tractor-trailer manufacturers nevertheless contended that negligence claims were preempted.

The Supreme Court held that there was no express or implied preemption because there was no federal standard in effect that addressed stopping distances or stability for trucks.[52] The Supreme Court hinted, however, that tort claims under state law had the potential to conflict with the Safety Act if safety standards promulgated thereunder did address a particular device:

Nothing in the Safety Act or its regulations currently regulates the use of ABS devices. As Standard 121 imposes no requirements either requiring or prohibiting ABS systems, tractor-trailer manufacturers are free to obey state standards concerning stopping distances and vehicle stability.... In the absence of a promulgated safety standard, the Act simply fails to address the need for ABS devices at all. Further, Standard 121 currently has nothing to say concerning ABS devices one way or the other, and NHTSA has not ordered truck manufacturers to refrain from using ABS devices. A finding of liability ... would undermine no federal objectives or purposes with respect to ABS devices, since none exist.[53]

When it issued *Myrick*, the United States Supreme Court also had before it a petition for certiorari seeking review of *Hernandez–Gomez v. Leonardo*,[54] which had held that no-lap-belt claims are not expressly preempted. The Supreme Court granted certiorari, vacated the judgment, and remanded the case for further consideration in light of *Myrick*.[55] On remand, the Arizona court again concluded that there was no express preemption, then conducted an implied preemption analysis as indicated by *Myrick*, and held that there was no implied preemption.[56] A second petition for certiorari was not filed. Thus, while the United States Supreme Court has opined on some aspects of the Safety Act, the dispositive issues in this case remain unanswered by that court.

There are, however, a number of federal and state court decisions that have addressed preemption of claims that a vehicular restraint system was defective or negligently designed. Most of these cases have consid-

**47.** *Id.* § 1397(k).

**48.** 514 U.S. 280, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995).

**49.** *Id.* at 287 n. 3, 115 S.Ct. 1483.

**50.** *Id.* at 283, 115 S.Ct. 1483.

**51.** *Id.* at 285, 115 S.Ct. 1483 (quoting *Paccar, Inc. v. NHTSA*, 573 F.2d 632, 643 (9th Cir.), *cert. denied*, 439 U.S. 862, 99 S.Ct. 184, 58 L.Ed.2d 172 (1978)).

**52.** *Id.* at 286, 115 S.Ct. 1483.

**53.** *Id.* at 289–90, 115 S.Ct. 1483.

**54.** 180 Ariz. 297, 884 P.2d 183 (1994).

**55.** *Volkswagen of Am., Inc. v. Hernandez–Gomez*, 514 U.S. 1094, 115 S.Ct. 1819, 131 L.Ed.2d 742 (1995).

**56.** *Hernandez–Gomez v. Leonardo*, 185 Ariz. 509, 917 P.2d 238, 246 (1996).

ered the failure to furnish an airbag, although a number of decisions have considered claims based on the absence of a lap belt. I agree with the Court that there is no valid basis for distinguishing between no-lap-belt and no-airbag claims.[57] Both seek to impose liability even though the manufacturer was given the option by federal regulations of supplying a restraint system that did not have a lap belt or one that did not have an airbag.[58] The fact that the Alvarados are claiming that a lap belt rather than an airbag should have been furnished does not affect the analysis of whether their common-law claims are the equivalent of imposing a "safety standard" that is "not identical" to the federal standard within the meaning of the express preemption clause of the Safety Act.[59] I part company with the Court, however, when it rejects the reasoning of so many other courts that have concluded such claims are preempted.

While there are decisions that have concluded there is no preemption,[60] the Court identifies some of the decisions in other jurisdictions that have held no-lap-belt or no-airbag claims are either expressly[61] or impliedly[62] preempted. These are only a few of the cases that address preemption of such claims. A more extensive listing may be found in *Cellucci v. General Motors Corp.*,[63] and *Cooper v. General Motors Corp.*[64] Further, at least two federal district courts applying Texas law have concluded no-airbag claims are impliedly preempted,[65] and another federal district court applying Texas law has held that claims were preempted to the extent they alleged an inadequate warning that lap belts must be worn.[66] Two Texas courts of appeals have also indicated that there is preemption.[67]

In implicit recognition of the fact that it has today gone against the weight of authority, the Court asserts that the more recent "trend" is toward finding no preemption.[68] This is not borne out when the decisions are analyzed. More recent cases that have found no-lap-belt, no-airbag, or analogous claims to be preempted are numerous and include decisions of the Seventh, Ninth, and Tenth Circuit Courts of Appeals and the courts of last resort of Idaho, Mississippi, and Pennsylvania.[69]

57. *See* 974 S.W.2d at 5 n. 6.

58. *See* 49 C.F.R. § 571.208, S4.5.3.

59. 15 U.S.C. § 1392(d).

60. *See* 974 S.W.2d at 5 n. 7; *see also Perry v. Mercedes Benz of North Am., Inc.*, 957 F.2d 1257 (5th Cir.1992) (holding that a claim that an airbag was defectively designed because it failed to open was not preempted); *Shipp v. General Motors Corp.*, 750 F.2d 418 (5th Cir.1985) (holding no preemption although manufacturer complied with roof strength regulations).

61. *See* 974 S.W.2d at 5 n. 7; *Schlotz v. Hyundai Motor Co.*, 557 N.W.2d 613 (Minn.Ct.App.) (holding no-lap-belt claim preempted), *cert. denied*, ⸺ U.S. ⸺, 118 S.Ct. 80, 139 L.Ed.2d 38 (1997); *see also Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291 (7th Cir.1997) (holding that the Safety Act preempted a claim that a windshield retention system in truck was defective), *cert. denied*, ⸺ U.S. ⸺, 118 S.Ct. 697, 139 L.Ed.2d 641 (1998).

62. *See* 974 S.W.2d at 5 n. 7.

63. 550 Pa. 407, 706 A.2d 806, 812–13 n. 4 (1998).

64. 702 So.2d 428, 433–34 (Miss.1997).

65. *See Dallas v. General Motors Corp.*, 725 F.Supp. 902 (W.D.Tex.1989); *Surles v. Ford Motor Co.*, 709 F.Supp. 732 (N.D.Tex.1988).

66. *Martin v. Ford Motor Co.*, 914 F.Supp. 1449 (S.D.Tex.1996).

67. *Marrs v. Ford Motor Co.*, 852 S.W.2d 570, 577 (Tex.App.—Dallas 1993, no writ) (holding no-airbag claim was impliedly preempted); *see also Brewer v. General Motors Corp.*, 926 S.W.2d 774, 780 (Tex.App.—Texarkana 1996), *modified*, 959 S.W.2d 187 (Tex.1998) (indicating some design defect claims were preempted).

68. 974 S.W.2d at 6.

69. *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291 (7th Cir.1997) (windshield retention system), *cert. denied*, ⸺ U.S. ⸺, 118 S.Ct. 697, 139 L.Ed.2d 641 (1998); *Harris v. Ford Motor Co.*, 110 F.3d 1410 (9th Cir.1997) (airbag); *Montag v. Honda Motor Co.*, 75 F.3d 1414 (10th Cir.) (airbag), *cert. denied*, ⸺ U.S. ⸺, 117 S.Ct. 61, 136 L.Ed.2d 24 (1996); *Zimmerman v. Volkswagen of Am., Inc.*, 128 Idaho 851, 920 P.2d 67 (1996) (lap belt), *cert. denied*, ⸺ U.S. ⸺, 117 S.Ct. 1245, 137 L.Ed.2d 327 (1997); *Cooper v. General Motors Corp.*, 702 So.2d 428 (Miss.1997) (airbag); *Cellucci v. General Motors Corp.*, 550 Pa. 407, 706 A.2d 806 (Pa.1998) (airbag); *see*

I also take issue with this Court's interpretation of United States Supreme Court decisions that have considered the preemptive effect of statutes other than the Safety Act and their application to this case, the subject to which I now turn.

## IV

The threshold questions in determining the preemptive reach of the Safety Act are 1) whether liability under the common law imposes a "safety standard" that is "not identical" to a federal safety standard applicable to "the same aspect of performance," and 2) the meaning and effect of the savings clause.

### A

The term "safety standard" is defined under the Act:

> (2) "Motor vehicle safety standards" means a minimum standard for motor vehicle performance, or motor vehicle equipment performance, which is practicable, which meets the need for motor vehicle safety and which provides objective criteria.[70]

The Court describes the safety standards as "minimum" standards.[71] This is accurate with respect to a manufacturer. A manufacturer may exceed the standards. But the safety standards are not minimums with regard to state regulation; they are absolute. States may not impose a safety standard that differs in any respect from the federal regu-

lations. The preemption clause of the Safety Act expressly removes any authority of a State to establish or to continue in effect "any safety standard applicable to the same aspect of performance . . . which is not identical to the Federal standard."[72] The Court concludes that the Alvarados' common-law claims do not "establish, or . . . continue in effect" a "safety standard,"[73] but decisions of the United States Supreme Court indicate otherwise.

In *Cipollone*, six members of the United States Supreme Court agreed that the terms "requirement or prohibition" in the Public Health Cigarette Smoking Act of 1969[74] included common-law claims.[75] The Court reasoned that the phrase " 'requirement or prohibition' sweeps broadly and suggests no distinction between positive enactments and common law."[76] The Court observed that state regulation can be as effectively exerted through an award of damages as through some form of preventive relief.[77] " 'The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.' "[78]

A majority of the United States Supreme Court reasoned in *Cipollone* that common-law damage actions are premised on the existence of a legal duty and that such actions impose "requirements or prohibitions."[79] The Court explained that "it is the essence of the common law to enforce duties that are

*also Martinez v. Ford Motor Co.*, 224 Mich.App. 247, 568 N.W.2d 396 (1997) (airbag); *Schlotz v. Hyundai Motor Co.*, 557 N.W.2d 613 (Minn.Ct. App.) (lap belt), *cert. denied,* — U.S. —, 118 S.Ct. 80, 139 L.Ed.2d 38 (1997); *Miranda v. Fridman*, 276 N.J.Super. 20, 647 A.2d 167 (App. Div.1994) (lap belt); *Panarites v. Williams*, 216 A.D.2d 874, 629 N.Y.S.2d 359 (N.Y.App.Div. 1995) (airbag or automatic seatbelt); *Dykema v. Volkswagenwerk, AG*, 189 Wis.2d 206, 525 N.W.2d 754 (App.1994) (lap belt), *cert. denied,* 516 U.S. 811, 116 S.Ct. 60, 133 L.Ed.2d 23 (1995); *Boyle v. Chrysler Corp.*, 177 Wis.2d 207, 501 N.W.2d 865 (App.1993) (airbag).

**70.** 15 U.S.C. § 1391(2). At the time the 1988 Excel was manufactured, motor vehicle safety standards were developed and issued by the Secretary of Transportation. *See* 15 U.S.C. § 1392(a). The authority to promulgate standards has since been delegated by the Secretary to the Administrator of the National Highway

Traffic Safety Administration (NHTSA). *See* 49 C.F.R. § 1.50(a).

**71.** *See* 974 S.W.2d at 7.

**72.** 15 U.S.C. § 1392(d).

**73.** *Id.; see* 974 S.W.2d at 7.

**74.** 15 U.S.C. §§ 1331–1340.

**75.** 505 U.S. at 521, 112 S.Ct. 2608.

**76.** *Id.*

**77.** *Id.*

**78.** *Id.* (quoting *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959)).

**79.** *Id.* at 522, 112 S.Ct. 2608.

either affirmative *requirements* or negative *prohibitions*."[80] A plurality of the Court continued, "[t]he central inquiry in each case is straightforward: we ask whether the legal duty that is the predicate of the common-law damages action constitutes a 'requirement or prohibition based on smoking and health ... imposed under State law with respect to ... advertising or promotion.'"[81]

In negligence and products liability claims alleging uncrashworthiness, the basic premise of the cause of action is that there has been a breach of a duty to meet some minimum standard of safety. Thus, state law would impose a "safety standard" that is "not identical" to a federal safety standard under the Safety Act if liability attached as a result of the failure to include equipment that federal law permitted the manufacturer to omit.

In an analogous case, the United States Supreme Court held in *CSX Transportation, Inc. v. Easterwood*[82] that a common-law negligence cause of action alleging excessive speed of a train was a "more stringent law, rule, regulation, order, or standard" than a federal safety regulation "covering" the maximum speed of trains under the Federal Railroad Safety Act of 1970.[83] The Supreme Court concluded that legal duties imposed by the common law fell within the scope of the broad terms "law, rule, regulation, order, or standard."[84] The Supreme Court similarly held in *International Paper Co. v. Ouellette* that state common-law nuisance claims against an out-of-state source of pollution were preempted by water discharge standards under the Clean Water Act.[85]

The decision in *CSX* also undercuts this Court's conclusion that since the safety standards under the Safety Act are "minimum" standards,[86] the common law may impose liability for failure to include lap belts. The claimants in *CSX* contended that, because the federal regulations set maximum allowable speeds for trains, the common law could nevertheless impose liability when a train was traveling at less than the maximum rate if a common-law duty to operate the train at a moderate and safe rate of speed was breached. The United States Supreme Court rejected this argument, observing that the regulations governing the maximum speed of trains "reveal that the limits were adopted only after the hazards posed by the track conditions were taken into account."[87] The Court admonished that state regulation of the speed of trains through damage suits was foreclosed by federal regulations that permitted trains to travel up to certain speeds:

> Understood in the context of the overall structure of the regulations, the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation of the sort that respondent seeks to impose on petitioner.[88]

The regulatory scheme governing seat belts is similar to the regulation of the speed of trains in *CSX*. In adopting safety standards pursuant to the Safety Act, the Secretary of Transportation considered various alternatives for restraining passengers in a crash. As in *CSX*, the safety standards preclude additional state regulation by means of common-law claims.

80. *Id.* (emphasis added).

81. *Id.* at 523, 112 S.Ct. 2608; *see also American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 439 (Tex.1997) (following *Cipollone* and holding that post–1969 common-law claims regarding failure to warn were preempted).

82. 507 U.S. 658, 662 n. 2, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993).

83. 45 U.S.C. § 434 (1988 and Supp. II).

84. 507 U.S. at 675, 113 S.Ct. 1732.

85. 479 U.S. 481, 496, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987); *see also Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291 (7th Cir.) (holding that

safety standard promulgated under the Safety Act that addressed windshields preempted common-law claims), *cert. denied*, — U.S. ——, 118 S.Ct. 697, 139 L.Ed.2d 641 (1997). *But cf. Moore v. Brunswick Bowling & Billiards Corp.*, 889 S.W.2d 246, 250 (Tex.1994) (common-law claim for defective design of product was not a "law or regulation" within the meaning of the Federal Boat Safety Act).

86. 15 U.S.C. § 1391(2).

87. 507 U.S. at 674, 113 S.Ct. 1732.

88. *Id.*

The Court's decision today is also at odds with two of our recent decisions, *Worthy v. Collagen Corp.*[89] and *Continental Airlines v. Kiefer.*[90] Only four months ago, we unanimously held in *Worthy* that a federal statute's express preemption clause foreclosed common-law damage claims. The statute under scrutiny in *Worthy* provided:

> [N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.[91]

We likewise recognized in *Continental Airlines v. Kiefer* that a suit brought by private parties constitutes enforcement of state law.[92] The Court makes no effort to distinguish these decisions and would be hard-pressed to do so. In both of those cases, we followed decisions of the United States Supreme Court and equated a "requirement" with common-law damage claims under state law. It is difficult to see how a "safety standard" imposed by the common law is any different from a "requirement" imposed by the common law.

Accordingly, the express preemption clause of the Safety Act would expressly preempt the Alvarados' claims. However, the savings clause must also be considered.

## B

The savings clause speaks directly to common-law claims. At the time the Excel was manufactured, the Safety Act provided: "Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law."[93] (Non-substantive revisions were made when the statute was recodified.[94]) At first blush, this would appear to save all common-law claims. This Court's task, however, is not to focus on " 'a single sentence . . . but [to] look to the provisions of the whole law.' "[95]

The United States Supreme Court has given us guidance regarding the meaning and effect of savings clauses. In *Morales v. Trans World Airlines, Inc.*, the Supreme Court held that a general savings clause "cannot be allowed to supersede the specific substantive preemption provision."[96] Accordingly, *Morales* held that, notwithstanding a savings clause, an express preemption provision precluded the States from prohibiting allegedly deceptive advertising of airline fares through enforcement of consumer protection statutes.[97] The federal statute under scrutiny expressly preempted the States from

> enact[ing] or enforc[ing] any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier.[98]

The savings clause provided:

> Nothing . . . in this chapter shall in any way abridge or alter the remedies now existing at common-law or by statute, but the provisions of this chapter are in addition to such remedies.[99]

**89.** 967 S.W.2d 360 (Tex.1998).

**90.** 920 S.W.2d 274 (Tex.1996).

**91.** 21 U.S.C. § 360k(a) (1997).

**92.** 920 S.W.2d 274, 281 (Tex.1996) (citing *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995)).

**93.** 15 U.S.C. § 1397(k).

**94.** *See* 49 U.S.C. § 30103(e) (1997).

**95.** *Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88, 99, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 51, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (internal quotation marks and citations omitted)).

**96.** 504 U.S. 374, 385, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992).

**97.** *Id.* at 391, 112 S.Ct. 2031.

**98.** 49 U.S.C. § 1305(a)(1) (1978) (current version at 49 U.S.C. § 41713 (1998)).

**99.** *Id.* § 1506 (1978) (current version at 49 U.S.C. § 40120 (1998)).

In *Morales,*[100] the Supreme Court quoted from *International Paper Co. v. Ouellette,* which said: "we do not believe Congress intended to undermine this carefully drawn statute through a general saving clause."[101] *Morales* and *International Paper* cast considerable doubt on this Court's conclusion that the savings clause in the Safety Act preserves common-law claims when a federal safety standard addresses the very aspect of the vehicle's performance that is allegedly deficient.

However, in dicta in *Cipollone,* the United States Supreme Court did indicate that a savings clause could save common-law claims from the reach of an express preemption clause. The Court pointed to the Comprehensive Smokeless Tobacco Health Education Act of 1986,[102] which prohibited the States from imposing a " 'statement relating to the use of smokeless tobacco products and health.' "[103] The Supreme Court concluded that there was no general, inherent conflict between federal preemption of state warning requirements and the preservation of common-law damage claims under the savings clause.[104] The savings clause in the Comprehensive Smokeless Tobacco Health Education Act is similar to the one at issue here.[105]

This Court does not discuss *Morales, International Paper,* or the tension between those decisions and the dicta in *Cipollone.* Instead, the Court declares that "[i]n [its] view, the savings clause would be rendered virtually meaningless if it did not preserve

claims such as the Alvarados'."[106] That statement reflects the shallowness of the Court's reasoning. The safety standards would not preempt a manufacturing defect claim. And it would seem that if an airbag that otherwise complied with the safety standards were to injure an infant when it deployed, the Safety Act would not preempt a claim that the manufacturer should have provided a warning not to place an infant in the front seat. These are just a few examples in which the savings clause would not be "meaningless" even though the manufacturer complied with the applicable safety standard.

This Court also quotes congressional committee reports and statements of individual members of Congress to support its view that the Safety Act does not preempt *any* common law claims.[107] Of course, the United States Supreme Court has admonished that the "remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history"[108] and that "reliance on the legislative history to support [an] interpretation of [a statute] shows just how treacherous that task can be."[109] It is "hazardous at best."[110] Moreover, statements by congressional staffers and individual members of Congress that were made when the savings clause of Safety Act was considered are not clear. The Senate Committee Report said that the Safety Act would "not necessarily" preempt common-law claims:

At the same time, the committee believes that the States should be free to adopt standards identical to the Federal standards ... so that the States may play a

**100.** 504 U.S. at 385, 112 S.Ct. 2031.

**101.** 479 U.S. 481, 494, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987).

**102.** 15 U.S.C. §§ 4401–4408 (1986).

**103.** 505 U.S. at 518, 112 S.Ct. 2608 (quoting 15 U.S.C. § 4406).

**104.** *Id.*

**105.** The savings clause in the Smokeless Tobacco Act provides:

  **(c) Effect on liability laws**

  Nothing in this chapter shall relieve any person from liability at common-law or under State statutory law to any other person.
  15 U.S.C. § 4406(c).

The savings clause of the Safety Act provides:

  **Continuation of common-law liability**

    (c) Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common-law.
  15 U.S.C. § 1397(k).

**106.** 974 S.W.2d at 8.

**107.** *See id.* at 8.

**108.** *Chrysler Corp. v. Brown,* 441 U.S. 281, 311, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979).

**109.** *Id.*

**110.** *Board of Ed. v. Mergens,* 496 U.S. 226, 242, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990).

significant role in the vehicle safety field. . . . [T]he federal minimum safety standards need not be interpreted as restricting State common-law standards of care. Compliance with such standards would thus not necessarily shield any person from product liability at common-law.[111]

The Report from the House was more direct:

It is intended, and this subsection specifically establishes, that compliance with safety standards is not to be a defense or otherwise to affect the rights of parties under common-law particularly those relating to warranty, contract, and tort liability.[112]

When these congressional reports were prepared, no court in the country had recognized crashworthiness claims. Because of this fact, the First Circuit concluded in *Wood v. General Motors Corp.* that Congress did not intend for the savings clause in the Safety Act to save crashworthiness claims.[113] The *Wood* opinion pointed to *Evans v. General Motors Corp.*,[114] decided the same year that the Safety Act was passed, which held that a plaintiff failed to state a cause of action by alleging that a car was uncrashworthy. At least one other court has disagreed with the analysis in *Wood,* concluding in *Taylor v. General Motors Corp.*,[115] that the seminal decision of *Larsen v. General Motors Corp.*,[116] which in 1968 recognized a crashworthiness claim, was foreshadowed by "scholarly commentary." The Eighth Circuit nevertheless held in *Taylor* that uncrash-

worthinesss claims in an airbag case were impliedly preempted.[117]

Irrespective of whether Congress was cognizant of potential common-law crashworthiness claims when it originally enacted the Safety Act, there has now been more than two decades of crashworthiness litigation. Congress certainly was aware of such claims when, in 1991, it amended the Safety Act and mandated airbags combined with lap and shoulder belts for the two front seats in all new automobiles.[118] Those amendments indicate that Congress intended to preempt no-airbag claims.

The 1991 amendments said: "Nothing in this section or in the amendments made under this section to Federal Motor Vehicle Safety Standard 208 shall be construed by any person or court as indicating an intention by Congress to affect, change, or modify in any way the liability, if any, of a motor vehicle manufacturer under applicable law relative to vehicles with or without inflatable restraints." [119] Congress intended to leave "applicable law" unaffected, and in 1991, the Safety Act had been construed by the overwhelming weight of authority as preempting no-airbag claims. Virtually all state and federal appellate courts and the vast majority of federal district courts had held that no-airbag claims were preempted.[120] Only three decisions issued prior to 1991 had concluded that no-airbag claims were not preempted. One was a decision of an intermediate state appellate court, and the two others were decisions of federal district courts.[121] By

111. S.Rep. No. 89–1301, at 12 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2709, 2720.

112. H.R.Rep. No. 89–1776, at 24 (1966).

113. *See Wood v. General Motors Corp.,* 865 F.2d 395, 403–406 (1st Cir.1988), *cert. denied,* 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 782 (1990).

114. 359 F.2d 822 (7th Cir.), *cert. denied,* 385 U.S. 836, 87 S.Ct. 83, 17 L.Ed.2d 70 (1966). (Eleven years later, the Seventh Circuit overruled this case. *Huff v. White Motor Corp.,* 565 F.2d 104 (7th Cir.1977).)

115. 875 F.2d 816, 825 (11th Cir.1989), *cert. denied,* 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990).

116. 391 F.2d 495 (8th Cir.1968).

117. *See* 875 F.2d at 827.

118. *See* 49 U.S.C. § 30127(f)(2).

119. Pub.L. No. 102–240, § 2508(d), 105 Stat. 1914, 2086 (1991) (codified with some differences in language at 49 U.S.C. § 30127(f)(2)).

120. *See* 974 S.W.2d at 5 n. 7; *see also* cases cited in *Cellucci,* 706 A.2d at 812–13 n.4 and *Cooper,* 702 So.2d at 433.

121. *See Gingold v. Audi–NSU–Auto Union,* 389 Pa.Super. 328, 567 A.2d 312 (1989); *Garrett v. Ford Motor Co.,* 684 F.Supp. 407 (D.Md.1987), *rev'd sub nom. Kitts v. General Motors Corp.,* 875 F.2d 787 (10th Cir.1989); *Murphy v. Nissan Motor Corp.,* 650 F.Supp. 922 (E.D.N.Y.1987).

contrast, four federal circuit courts, numerous federal district courts, and many state courts had ruled otherwise.[122] It was only after the Supreme Court's decision in *Cipollone* that a few appellate courts began to conclude that there was no preemption.[123] But as will be discussed below, the Supreme Court has more recently explained that *Cipollone* has been mis-read by some courts.

In rejecting preemption, this Court discusses the 1991 amendments to the Safety Act and the intent of Congress expressed therein that the amendments did not change applicable law. The Court refers to *Larsen v. General Motors Corp.*,[124] *Shipp v. General Motors* Corp.,[125] and *Sours v. General Motors Corp.*,[126] all decided prior to the 1991 amendments, as authority for the proposition that claims were not preempted.[127] Although those decisions indicate that state common-

law causes of action did not incorporate the safety standards under the Safety Act as the applicable standard of care, none of these decisions addressed federal preemption. A fourth case cited by the Court, *Ellis v. K–Lan Co.*, had nothing whatsoever to do with the Safety Act and did not consider the question of federal preemption.[128]

In light of the history of the Safety Act and its express preemption provision, I agree with most courts that have addressed the issue and would hold that no-lap-belt claims are expressly preempted.[129] The Safety Act savings clause does not save common-law claims that directly conflict with options granted by federal safety standards.[130] A general savings clause should not be read to undermine federal policy embodied in a statutory scheme.[131] Federal regulations give manufacturers several, although limited, op-

**122.** *See Pokorny v. Ford Motor Co.*, 902 F.2d 1116 (3d Cir.1990) (airbag); *Kitts v. General Motors Corp.*, 875 F.2d 787 (10th Cir.1989) (airbag); *Taylor v. General Motors Corp.*, 875 F.2d 816 (11th Cir.1989) (airbag), *cert. denied*, 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990); *Wood v. General Motors Corp.*, 865 F.2d 395 (1st Cir.1988) (airbag), *cert. denied*, 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 782 (1990); *see, e.g., Wickstrom v. Maplewood Toyota, Inc.*, 416 N.W.2d 838 (Minn.Ct.App.1987) (airbag); *Gardner v. Honda Motor Co., Ltd.*, 145 A.D.2d 41, 536 N.Y.S.2d 303 (1988) (airbag); *see also* cases cited in *Cellucci*, 706 A.2d at 812–13 n.4 and *Cooper*, 702 So.2d at 433.

**123.** *See, e.g., Doyle v. Volkswagenwerk Aktiengellschaft*, 114 F.3d 1134 (11th Cir.1997) (lap belt), *cert. denied*, —— U.S. ——, 118 S.Ct. 1300, 140 L.Ed.2d 466 (1998); *Munroe v. Galati*, 189 Ariz. 113, 938 P.2d 1114 (1997) (airbag); *Hernandez–Gomez v. Leonardo*, 185 Ariz. 509, 917 P.2d 238 (1996) (lap belt); *Ketchum v. Hyundai Motor Co.*, 49 Cal.App.4th 1672, 57 Cal.Rptr.2d 595 (1996) (lap belt); *Hyundai Motor Co. v. Phillip*, 639 So.2d 1064 (Fla.Dist.Ct.App.1994); *Wilson v. Pleasant*, 660 N.E.2d 327 (Ind.1995) (airbag); *Loulos v. Dick Smith Ford, Inc.*, 882 S.W.2d 149 (Mo.Ct.App.1994) (airbag); *Tebbetts v. Ford Motor Co.*, 140 N.H. 203, 665 A.2d 345 (1995) (airbag); *Drattel v. Toyota Motor Corp.*, 231 A.D.2d 326, 662 N.Y.S.2d 535 (1997) (airbag); *Minton v. Honda of Am. Mfg., Inc.*, 80 Ohio St.3d 62, 684 N.E.2d 648 (1997) (airbag); *Nelson v. Ford Motor Co.*, 108 Ohio App.3d 158, 670 N.E.2d 307 (1995) (airbag); *see also Cooper*, 702 So.2d at 436 (discussing cases decided after *Cipollone* and why they were incorrectly decided).

**124.** 391 F.2d 495, 506 (8th Cir.1968).

**125.** 750 F.2d 418, 421 (5th Cir.1985).

**126.** 717 F.2d 1511, 1517 (6th Cir.1983).

**127.** *See* 974 S.W.2d at 13.

**128.** 695 F.2d 157, 161 (5th Cir.1983) (discussing the Special Packaging of Household Substances for Protection of Children Act).

**129.** *See, e.g., Zimmerman v. Volkswagen of Am., Inc.*, 128 Idaho 851, 920 P.2d 67 (1996) (lap belt); *Schlotz v. Hyundai Motor Co.*, 557 N.W.2d 613 (Minn.Ct.App.1997) (lap belt); *Miranda v. Fridman*, 276 N.J.Super. 20, 647 A.2d 167 (App.Div.1994) (lap belt); *Dykema v. Volkswagenwerk AG*, 189 Wis.2d 206, 525 N.W.2d 754 (App.1994) (lap belt); *see also Harris v. Ford Motor Co.*, 110 F.3d 1410 (9th Cir.1997) (airbag); *Martinez v. Ford Motor Co.*, 224 Mich.App. 247, 568 N.W.2d 396 (1997) (airbag); *Wickstrom v. Maplewood Toyota, Inc.*, 416 N.W.2d 838 (Minn.Ct.App.1987) (airbag); *Panarites v. Williams*, 216 A.D.2d 874, 629 N.Y.S.2d 359 (1995) (airbag); *Gardner v. Honda Motor Co., Ltd.*, 145 A.D.2d 41, 536 N.Y.S.2d 303 (1988) (airbag); *Boyle v. Chrysler Corp.*, 177 Wis.2d 207, 501 N.W.2d 865 (App. 1993) (airbag).

**130.** *See, e.g., Pokorny v. Ford Motor Co.*, 902 F.2d 1116, 1125 (3d Cir.), *cert. denied*, 498 U.S. 853, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990); *Wood v. General Motors Corp.*, 865 F.2d 395, 413–14 (1st Cir.1988), *cert. denied*, 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 782 (1990); *Cellucci v. General Motors Corp.*, 550 Pa. 407, 706 A.2d 806, 811 (1998).

**131.** *See, e.g., Zimmerman*, 920 P.2d at 72.

tions. Lap belts are but one option for restraining passengers, and the regulations authorize a manufacturer not to include lap belts if one of the other specified options is chosen. Preemption arises because common-law liability for failing to choose one restraint system over another establishes a higher standard than the federal regulations, contrary to the express intent and purposes of the federal regulatory scheme.

A decision that there is express preemption ordinarily would obviate the need to consider the question of implied preemption. However, the United States Supreme Court has not resolved the conflict among the decisions in this area. Therefore, like the Arizona supreme court in *Hernandez–Gomez v. Leonardo,* I take the "jurisprudentially safer course" of proceeding with an implied preemption analysis.[132]

## V

Prior to the *Cipollone* decision in 1992, the overwhelming number of courts confronted with no-lap-belt or no-airbag claims had held that such claims were impliedly preempted.[133] It was only after the *Cipollone* decision that some state courts and one federal circuit court held to the contrary.[134] Those courts concluded that the express preemption provision and the savings clause in the Safety Act precluded any consideration of implied preemption.[135] We now know, after the Supreme Court issued *Myrick* and explained its decision in *Cipollone,* that *Cipollone* "[a]t best … supports an inference that an express pre-emption clause forecloses implied pre-emption; it does not establish a rule."[136] Thus, even if a court were to conclude that there is no express preemption, resolution of the scope of an express preemption clause does not end the inquiry. Conflict preemption may still exist when it is "'impossible for a private party to comply with both state and federal requirements,'"[137] or when state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"[138]

I agree with this Court that it is not impossible for Hyundai to comply both with federal law and with a state common-law duty to include lap belts. The regulations promulgated under the Safety Act did not prohibit Hyundai from installing lap belts. The safety standards themselves specify that lap belts combined with shoulder belts may be used to meet certain requirements.[139] Nor is it "impossible" for Hyundai to comply with federal law and at the same time to respond in damages for breach of common-law duties.

I take issue with this Court's conclusion that the imposition of damages based on

**132.** 185 Ariz. 509, 917 P.2d 238, 243 (1996); *see also Wilson v. Pleasant,* 660 N.E.2d 327, 336–37 (Ind.1995).

**133.** *See, e.g., Pokorny v. Ford Motor Co.,* 902 F.2d 1116 (3d Cir.) (airbag), *cert. denied,* 498 U.S. 853, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990); *Kitts v. General Motors Corp.,* 875 F.2d 787 (10th Cir. 1989) (airbag); *Taylor v. General Motors Corp.,* 875 F.2d 816 (11th Cir.1989) (airbag), *cert. denied,* 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990); *Wood v. General Motors Corp.,* 865 F.2d 395 (1st Cir.1988) (airbag), *cert. denied,* 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 782 (1990); *see also* cases cited in *Cellucci,* 706 A.2d at 812–13 n.4, and *Cooper,* 702 So.2d at 433.

**134.** *See, e.g., Doyle v. Volkswagenwerk Aktiengelellschaft,* 114 F.3d 1134 (11th Cir.1997) (lap belt), *cert. denied,* — U.S. ——, 118 S.Ct. 1300, 140 L.Ed.2d 466 (1998); *Munroe v. Galati,* 189 Ariz. 113, 938 P.2d 1114 (1997) (airbag); *Hernandez–Gomez v. Leonardo,* 185 Ariz. 509, 917 P.2d 238 (1996) (lap belt); *Ketchum v. Hyundai Motor Co.,* 49 Cal.App.4th 1672, 57 Cal.Rptr.2d 595 (1996) (lap belt); *Hyundai Motor Co. v. Phillip,* 639 So.2d 1064 (Fla.Dist.Ct.App.1994); *Wilson v. Pleasant,* 660 N.E.2d 327 (Ind.1995) (airbag); *Loulos v. Dick Smith Ford, Inc.,* 882 S.W.2d 149 (Mo.Ct.App.1994) (airbag); *Tebbetts v. Ford Motor Co.,* 140 N.H. 203, 665 A.2d 345 (1995) (airbag); *Drattel v. Toyota Motor Corp.,* 231 A.D.2d 326, 662 N.Y.S.2d 535 (N.Y.App.Div. 1997) (airbag); *Minton v. Honda of Am. Mfg., Inc.,* 80 Ohio St.3d 62, 684 N.E.2d 648 (1997) (airbag); *Nelson v. Ford Motor Co.,* 108 Ohio App.3d 158, 670 N.E.2d 307 (1995) (airbag).

**135.** *See, e.g., Loulos,* 882 S.W.2d at 152.

**136.** *Myrick,* 514 U.S. at 289, 115 S.Ct. 1483.

**137.** *Id.* at 287, 115 S.Ct. 1483 (quoting *English,* 496 U.S. at 79, 110 S.Ct. 2270).

**138.** *Id.* (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).

**139.** 49 C.F.R. § 571.208, S4.1.2.3.

common-law tort liability for failing to do more than the federal safety standards require would not " 'stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives' " of the Safety Act.[140] There is no difference between a state statute that requires all restraint systems to have a lap belt and a state common-law standard of conduct that exacts liability for failing to include a lap belt. Both impose higher safety standards than the federal scheme. I now turn to a closer analysis of the particulars of that federal scheme.

## A

One of the arguments advanced by the Alvarados and accepted by the Court is superficially compelling. It is that common-law damage claims are consistent with one of the purposes of the Safety Act, which is "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." [141] The establishment or continuation of common-law liability for design defects and negligence would advance that goal. Common-law liability may spur the automotive industry to develop safer designs.

In response to this argument, some courts have noted that safety is not the sole purpose of the Act.[142] The Safety Act does not mandate all higher safety standards at any cost, but only those safety standards determined by the Secretary of Transportation to be "reasonable, practicable and appropriate." [143] There must be a balancing.

Nevertheless, the United States Supreme Court has explained that focusing on only the respective purposes of the federal and state laws is not the proper framework for analyzing preemption. It is not enough to say that the purposes and goals of federal and state law are the same.[144] Indeed, "focus on 'whether the purposes of the two laws are parallel or divergent' tends to 'obscure more than aid' in determining whether state law is preempted by federal law." [145] Preemption analysis should turn not on whether federal and state law " 'are aimed at distinct and different evils' " but on whether they " 'operate upon the same object.' " [146] When the Safety Act and the regulations that are promulgated under it are studied, the conclusion that no-lap-belt claims "operate upon the same object" as the federal safety standards that govern occupant restraint systems is compelling. It is apparent that 1) Congress and the Secretary of Transportation carefully weighed competing interests in promulgating safety standards for occupant restraint systems, 2) a two-point system such as the one at issue in this case was studied and authorized in the rule promulgating the safety standards, and 3) specific but limited options, including a system without a lap belt, were given for restraint systems and States are not permitted to further restrict those options.

## B

Not only do no-lap-belt claims operate on the same object as the federal safety standards, but they also conflict with those standards. The clash with the Safety Act arises because liability for failing to furnish a lap belt penalizes a manufacturer for choosing an option that is expressly granted under the federal scheme of regulation.[147] Allowing no-

140. *Myrick*, 514 U.S. at 281, 115 S.Ct. 1483 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).

141. 15 U.S.C. § 1381.

142. *See, e.g., Harris v. Ford Motor Co.*, 110 F.3d 1410, 1412 n. 3 (9th Cir.1997).

143. 15 U.S.C. § 1392(f)(3); *see also Harris*, 110 F.3d at 1412 n. 3.

144. *See Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88, 103, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992); *International Paper Co. v.*

*Ouellette*, 479 U.S. 481, 494, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987).

145. *Gade*, 505 U.S. at 106, 112 S.Ct. 2374 (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 141–42, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963)).

146. *Id.* (quoting *Napier v. Atlantic Coast Line R.R. Co.*, 272 U.S. 605, 612, 47 S.Ct. 207, 71 L.Ed. 432 (1926)).

147. *See Lewis v. Brunswick Corp.*, 107 F.3d 1494, 1501–02 (11th Cir.1997) (holding that common-law damage claim conflicted with decision of

lap-belt claims to proceed would undercut the federal statutory grant of authority to the Secretary, who is to balance the safety of one system against the safety of another while also taking into account other factors, including public acceptance and cost.[148] The Ninth Circuit in *Harris v. Ford Motor Co.* correctly observed that the Secretary considered increased safety from airbags as well as their cost in declining to mandate airbags.[149]

Rather than mandate or prohibit a particular belt assembly or airbags, the Secretary gave manufacturers options, within prescribed limits, of how to configure their restraint systems as long as certain performance requirements were met. Federal law expressly allowed the choice to be made among imperfect systems, recognizing that any one system cannot prevent all injuries. The Secretary could have mandated lap belts but did not. The balance was to be struck by the Secretary, not the States through courts and juries. In the context of the airbag litigation, a "judgment for [the claimant] would have an effect ... identical to a state statute or regulation requiring airbags in all vehicles." [150]

The regulations permitted Hyundai to choose a seatbelt system that did not include a lap belt. When Hyundai manufactured the Excel at issue in this case, which was July 12, 1988, Hyundai had specific options under FMVSS 208 for restraining passengers in the front passenger seat, called the "front outboard" position, where Mario Alvarado was sitting at the time of the accident. Some of the options called for lap belts; some did not. (Throughout FMVSS 208, lap belts are called "Type 1" seatbelt assemblies, and the combination pelvic and upper torso restraints are called "Type 2" assemblies. These terms are defined in 49 C.F.R. § 571.209, S3.)

Hyundai could have complied with one of three fairly detailed options: S4.1.2.1, S4.1.2.2, or S4.1.2.3.[151] Or, under S4.5.3, Hyundai could furnish an automatic seatbelt assembly that met the crash protection requirements under any one of the three options.[152] Under the first option (S4.1.2.1), lap belts were not mandatory. The first option required a manufacturer either (1) to install a completely passive restraint system that would meet specified performance crash requirements for frontal, lateral, and rollover collisions or (2) to install lap belts or a combination of pelvic and upper torso restraints in addition to the passive restraint that would meet frontal crash protection requirements and other performance requirements but not the rollover crash protection requirements.[153] The second option (S4.1.2.2) required passive protection plus lap belts and a seatbelt warning system. The performance requirements for this option included those for frontal crashes but did not include performance requirements for rollovers.[154] The third option required frontal crash protection through either a combination pelvic and upper torso restraint with a nondetachable shoulder belt or a lap belt, plus a seatbelt warning system. It had no performance requirements regarding rollovers.[155] Finally, under S4.5.3, Hyundai could choose an automatic belt system with a specified warning system that met the performance requirements of any one of the three more specific options.

Each of the three specific options referred to the frontal crash requirements in S5.1, which in turn specified not only detailed testing criteria but also incorporated the injury criteria in certain sections of S6.[156] Hyundai

Coast Guard under the Federal Boat Safety Act, 46 U.S.C. §§ 4301–4311, not to require propeller guards on boat motors), *cert. granted,* — U.S. ——, 118 S.Ct. 439, 139 L.Ed.2d 337 (1997), *and cert. dismissed per rule 46* (May 15, 1998).

148. *See generally* 15 U.S.C. § 1392(f); FMVSS, 49 Fed.Reg. 28962.

149. 110 F.3d 1410, 1412 n. 3 (9th Cir.1997); *see also Cellucci v. General Motors Corp.,* 550 Pa. 407, 706 A.2d 806, 810 (1998) (quoting and following *Harris* ).

150. *Harris,* 110 F.3d at 1412 n. 3, 1415.

151. 49 C.F.R. § 571.208.

152. *Id.*

153. *Id.* § 571.208, S4.1.2.1.

154. *Id.* § 571.208, S4.1.2.2.

155. *Id.* § 571.208, S4.1.2.3.

156. *Id.* § 571.208, S5.1.

asserts that it chose to furnish a passive restraint system under S.4.5.3 and to meet the performance requirements of option two.

The Alvarados contend that because there was no performance standard applicable to rollovers under option two, their common-law claims are not "applicable to the same aspect of performance" as FVMSS 208 within the meaning of the Safety Act.[157] This Court seems to agree.[158] That conclusion is untenable. Each of the options that was available to Hyundai addressed "crash protection requirements." Unlike the claim in *Freightliner Corp. v. Myrick*,[159] in which there were no regulations in effect under the Safety Act regarding stopping distances or vehicle stability for trucks or trailers, the regulations at issue here address the crashworthiness of passenger restraint systems in detail, including rollovers. Hyundai was expressly permitted by the regulations under FMVSS 208 to choose an option that did not include lap belts and that did not require compliance with rollover performance requirements, but Hyundai had to meet other "crash protection requirements." [160] The regulations provided detailed standards addressing the extent to which restraint systems must restrain. The common-law claims are "applicable to the same aspect of performance." [161]

Other courts that have addressed this question have reached differing conclusions. The Supreme Court of Idaho held in *Zimmerman v. Volkswagen of America, Inc.* that the regulation directly addressed performance requirements to protect vehicle occupants during crashes and that a no-lap-belt claim is preempted,[162] while the Supreme Court of Arizona held in *Hernandez–Gomez v. Leonardo* that there was no implied preemption in a rollover/lap belt case because the option chosen by the manufacturer did not relate to rollovers, only to frontal crashes.[163] In light of the express and detailed provisions of the regulations that directly address crash protection, *Zimmerman* is the better-reasoned decision.

One final issue that should be put to rest is whether the regulations authorized two-point restraint systems. While it is true that the regulations do not use the words "two-point restraint," the Secretary of Transportation approved the use of such a system, even though the Secretary expressly recognized that two-point restraints might be less effective than other systems in preventing ejection in rollovers.[164] The restraint system used by Hyundai was the same as the one used by Volkswagen, and that system was evaluated over the years by the Secretary in the process of promulgating safety standards.[165] The Secretary noted that "two passive restraint systems" appeared workable [166] and later that VW's shoulder and knee bolster system was "a proven means of meeting a passive restraint requirement." [167] In 1974, Volkswagen sought specific approval of its two-point system, and, as the Alvarados concede, the National Highway Traffic Safety Administration ruled that specific authorization was unnecessary because FMVSS 208 "already permits use of a passive belt system." [168] The passive restraint system used by Hyundai was permitted as an option un-

---

157.  15 U.S.C. § 1392(d).

158.  *See* 974 S.W.2d at 6.

159.  514 U.S. at 285–86, 115 S.Ct. 1483.

160.  *See* 49 C.F.R. § 571.208.

161.  15 U.S.C. § 1392(d).

162.  128 Idaho 851, 920 P.2d 67, 70–71 (1996).

163.  185 Ariz. 509, 917 P.2d 238, 246 (1996).

164.  *See, e.g.,* FMVSS, 49 Fed.Reg. 28962, 28985.

165.  *See, e.g.,* FMVSS, 49 Fed.Reg. at 28965. The Secretary observed:

One design takes advantage of the opportunity for the manufacturer to include, on a strictly voluntary basis, an ignition interlock. The belt in that design detaches from the door, but must be reattached before the car can be started the next time. This type of automatic belt (2–point belt with knee bolster) has been installed in more than 390,000 Volkswagen (VW) Rabbits over an eightyear period beginning in 1975. It was also installed on a small number of 1978–79 General Motors (GM) Chevettes. It is still available as an option on Rabbits.

166.  FMVSS, 41 Fed.Reg. 24070, 24070 n.2, 24072.

167.  FMVSS, 42 Fed.Reg. 34295.

168.  39 Fed.Reg. 3834.

der the federal regulations as long as it met the performance requirements specified in one of the three options under FMVSS 208.[169]

A common-law duty to provide lap belts under a negligence or strict liability theory is a safety standard that is "not identical" to FMVSS 208. The Alvarados' common-law claims directly conflict with the federal regulatory scheme and thus are preempted if Hyundai satisfied the requirements of S4.5.3.

\* \* \* \* \*

Federal law preempts the Alvarados' no-lap-belt claims. Accordingly, I dissent.